684 P.2d 1163

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Loretta BRANCHAL,
Defendant-Appellant.**

No. 7396.

Court of Appeals of New Mexico.

June 7, 1984.

Certiorari Denied July 19, 1984.

Paul Bardacke, Atty. Gen., William Lazar, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Janet Clow, Chief Public Defender, Henry R. Quintero, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

NEAL, Judge.

This is a homicide case. The evidence details a stormy six-year relationship which ended when the defendant fired a single bullet into the victim's chest, killing him. Our concern is with the denial of a self-defense instruction.

Originally tried on an open charge of murder, the defendant was acquitted of first and second degree murder. The jury could not agree on voluntary manslaughter and a mistrial was declared. On retrial on the voluntary manslaughter charge defendant claimed self-defense as she had done at the first trial. The court ruled that there was insufficient evidence to support self-defense, and excluded evidence of the victim's violent reputation, prior incidents which tended to establish violence by the victim toward defendant, and a psychologist's testimony concerning defendant's mental state when she fired the fatal shot. Two reasons were given by the court. First, defendant had not shown that at the time of the killing death or great bodily harm was imminent. Second, she provoked the encounter, and under *State v. Chavez*, 99 N.M. 609, 661 P.2d 887 (1983), she could not claim self-defense.

■ Concerning these two points, we discuss preservation of error, and the evidence. Because we hold that a self-defense instruction should have been given we do not reach a sentencing issue. Other issues raised in the docketing statement, but not briefed, are abandoned. *State v. Vogenthaler*, 89 N.M. 150, 548 P.2d 112 (Ct.App. 1976).

### 1. Preservation of error.

■ Defendant submitted the following requested instruction.

Evidence has been presented that the Defendant killed Benjie Romero while defending herself.

If Defendant killed Benjie Romero in self-defense you must find her not guilty.

The killing is in self-defense if:

1. There was an appearance of immediate danger of death or great bodily harm to the Defendant as a result of *her having confronted Benjie Romero with a gun;* and

2. The Defendant was in fact put in fear by the apparent danger of immediate death or great bodily harm and killed Benjie Romero because of that fear; and

3. The apparent danger would have cause [sic] a reasonable person in the same circumstances to act as the Defendant did.

The burden is on the state to prove beyond a reasonable doubt that the Defendant did not act in self-defense. (Emphasis added.)

*See* NMSA 1978, UJI Crim. 41.41 (Repl. Pamp.1982). As a corollary to the self-de-

fense instruction, defendant also submitted NMSA 1978, UJI Crim. 41.60 (Repl.Pamp. 1982) which instructs that a person threatened with an attack need not retreat. The State argues that defendant waived her right to complain of the failure to give a self-defense instruction because of her failure to tender a correct instruction. We disagree. The tendered instruction quoted above sufficiently tracked UJI Crim. 41.41. The fact that defendant unnecessarily limited her self-defense theory with this instruction does not amount to waiver. The issue of whether she provoked the encounter, upon which the State relies to argue that the instruction is incorrect, is one for the jury, given the conflicting evidence in the record. The tendered instruction was not incorrect.

### 2. Self-defense.

■ A valid self-defense claim consists of evidence that the defendant was put in fear by an apparent danger of immediate death or great bodily harm, that the killing resulted from that fear, and that the defendant acted as a reasonable person would act under those circumstances. *State v. Chavez; State v. Montano*, 95 N.M. 233, 620 P.2d 887 (Ct.App.1980).

■ Because a line of cases in New Mexico tends to create some confusion about the appropriate standard for determining when a self-defense instruction should be given, we briefly review the standard here.

Early cases indicate that a trial court was required to give a self-defense instruction whenever a defendant offered "any" evidence to support the theory. *See Territory v. Watson*, 12 N.M. 419, 78 P. 504 (1904); *State v. Martinez*, 30 N.M. 178, 230 P. 379 (1924). Later the Supreme Court referred to "substantial evidence though slight" as entitling the defendant to an instruction. *State v. Jones*, 52 N.M. 235, 195 P.2d 1020 (1948). In *State v. Heisler*, 58 N.M. 446, 272 P.2d 660 (1954), the Supreme Court quoted with approval from *Walker v. State*, 52 Ariz. 480, 83 P.2d 994 (1938):

It is the law in most jurisdictions that if there is evidence appearing in the record which would raise a reasonable doubt as to whether the homicide with which the defendant is charged was committed in self-defense, it is the duty of the trial court to instruct upon that issue * * * and a failure to so instruct is error. *See also State v. Montano*, 95 N.M. 233, 620 P.2d 887 (Ct.App.1980).

*State v. Martinez*, 95 N.M. 421, 622 P.2d 1041 (1981), requires evidence "sufficient to raise a reasonable doubt in the minds of the jury" to warrant an instruction on self-defense, while *State v. Chavez* describes the standard as requiring evidence to "support a finding by the jury" in favor of the defendant on all elements of self-defense. We read these recent cases in light of their predecessors to require a self-defense instruction whenever a defendant presents evidence sufficient to allow reasonable minds to differ as to all elements of the defense.

■ The victim was killed by defendant on the evening of September 8, 1982. The medical examiner testified that the victim had a blood alcohol level of .206. The medical examiner also testified that the victim was wearing a fingerless glove. Subsequent testimony by the defendant indicated that the victim wore the glove when he communicated with the devil. The victim believed the devil gave him powers.

The defendant and the victim lived together for over six years. The relationship was less than stable. Also living with them were defendant's sister and some children. It is not clear whether any of the children were the victim's.

The events of the night of the killing are disputed. The State's theory is that defendant killed the victim because she was angry. Evidence that twice that evening she threatened to kill the victim was introduced. Defense counsel attempted to portray the defendant as an abused woman who acted in self-defense.

About 5:30 that evening the victim was at his mother's, fixing a truck. Defendant went there and they then went home. They argued. The victim returned to his mother's house.

Defendant said that when the victim returned from his mother's he was drunk and belligerent. The victim began working on a light. Sparks came from the light but the victim was unafraid. To defendant, this meant he was really drunk. Often when he was drunk he was intolerable; sometimes defendant and the children left the house to sleep in old houses or old cars. Defendant was afraid it would happen again.

One of the children went to bed. The victim, still working on the light, wanted to wake the child. He said he wanted the "cabrona" (bitch) to bring him a screwdriver. Defendant told him to leave the children alone.

Defendant went to the truck, got a gun, and put it in the pocket of her housecoat.

A friend of the victim's, Mr. Baca, came to the house. The two men talked of God and the devil. Defendant was disturbed by the conversation and went into the kitchen with her sister. The two men came into the kitchen. They drank beer and rolled marijuana cigarettes. Defendant and her sister went to bed. A baby slept with defendant.

The victim came into the bedroom several times. He wanted blankets for Mr. Baca. He wanted something to eat. He shook the baby to wake her up. Defendant became angry and told the victim she would kill him except that he was so near the baby.

The victim told defendant he had four on his list. She had already heard about the list, which he often mentioned when he was drunk. It was a list of people he intended to kill. The four he was referring to were defendant's child, defendant's mother, and defendant's two brothers.

The victim began to sing: "El rey, yo sago el rey, no chinges con migo porque yo sago el rey." (The king, I am the king. Don't fuck with me because I am the king.)

Defendant got up and put the gun, which was apparently next to her on the mattress, into the pocket of her housecoat, and went into the kitchen. The victim followed, but went outside. He did not know defendant had a gun. Defendant locked the door.

The victim banged on the door, threatening to break it. Defendant let him in and told him to leave her and the children alone. The defendant's testimony concerning what happened next, follows:

Defendant: He started coming after me and the expression he had on his face and just by the way he looked, he got me scared.

Q. What kind of expression did he have on his face?

Defendant: Like real mad, like anger.

Q. This was an expression you had observed before?

Defendant: Not as much.

Q. I see. What happened after that?

Defendant: After that, he came towards me and I told him not to get near me. And he did.

Defendant said she tried to move away. The victim kept coming. It is not clear when defendant pulled the gun from her housecoat.

Defendant: I was thinking that I didn't want to kill him. I just wanted to get him scared like he used to get me scared. But it didn't work out. He just showed anger and more anger. That's when I figured that if I didn't shoot at him he was either gonna kill me, take the gun away from me or kill one of the kids, or kill me, or something. I just got so scared that I didn't know what to think. I just had to shoot.

Defendant fired a single shot, killing the victim.

Q. When you were in the kitchen, and you said Benjie was coming for you, * * why didn't you just run away?

Defendant: Because, being that we had been going arguing and fighting about it, I thought that if I would run away from him, he was going to find me, he was gonna go look for me and was gonna find me down at my mom's or somewhere. At the same time I thought to myself that if I would go away, my kids were gonna stay there and he could have killed one of them or hurt 'em.

\*    \*    \*    \*    \*    \*

Q. Why did you shoot Benjie?

Defendant: I was scared. I was scared of my life. I thought to myself that if I wouldn't have shot him, he would have probably shot me, one of the kids, or hurt us badly.

Court: Shot you with what, please?

Defendant: With a gun. If he would've taken the gun away from me, he would have shot me or one of the kids, or hurt me or hurt one of them.

Q. Did you think that that's what he was coming to do, come and take the gun?

Court: [admonishes counsel not to lead].

Q. When you said he was coming for you, did you think that he was coming to do anything?

Defendant: Yes, because he had tried to take it away from me before.

Q. What did you think he was going to do?

Defendant: He was going to take the gun away from me.

Toward the close of his examination of defendant, her counsel began to question her about past events. The State's objection was sustained; the court ruled that there was no evidence that immediate danger of death or great bodily harm was imminent, and that under *State v. Chavez*, because defendant provoked the encounter, she was not entitled to a self-defense instruction. Later, the court commented that it did not want to condone spousal retaliation for past violence. Out of the presence of the jury, defendant was allowed to make an offer of proof of evidence relevant to defendant's apprehension. This evidence included incidents when the victim hit defendant with a board; broke out the windows in defendant's mother's house and threatened defendant with a knife; threw defendant's daughter into a pigpen with a grown pig; forced defendant to eat at gunpoint; shot at her with a high-powered rifle; and forced defendant to touch a dead rattlesnake by menacing her with a knife and a gun. The tendered evidence also included one instance when the defendant called the police for assistance but was told that nothing could be done and that the family must resolve their problems on their own. Other tendered evidence would have shown that the victim had a reputation for violence, particularly toward old people. Through a state police officer defendant would have shown that on one occasion the victim terrorized, beat, and robbed an elderly couple.

Defendant also offered proof through Dr. Salazar, a psychologist, concerning her state of mind when she fired the fatal shot. The psychologist would have testified that she was a religious person and that she took the fingerless glove and the victim's invocation of the devil seriously. He would have explained the predictability of the victim's behavior when drunk, why defendant felt trapped in the kitchen and why she did not leave the victim. He would have testified that she was afraid for her life when she fired the fatal shot.

We believe the admitted evidence was sufficient to raise an issue of fact with respect to the elements of a self-defense claim. The evidence can support defendant's theory: that the victim started a fight, came after her in a threatening way, and that defendant pulled the gun and shot the victim because she feared for her life. While the assertion that she feared for her life, without more, might not be enough to support a finding of self-defense, the circumstances here would support such a finding.

■ The trial court excluded evidence of the victim's prior acts and defendant's actual state of mind. The tendered evidence with respect to past events bears directly on the reasonableness of defendant's apprehension, the apparent immediacy of danger, and the reasonableness of her actions. Because the admitted evidence raised an issue about which reasonable minds could differ as to defendant's self-defense claim, the tendered but excluded evidence as to past events should have been admitted. The tendered evidence with respect to defendant's state of mind also should have been admitted because it bears directly on whether the defendant *in fact* was put in fear.

*Territory v. Thomason,* 4 N.M. 154, 13 P. 223 (1887), states:

It is not doubted, where there is any evidence which tends to show, even in the slightest degree, that the deceased at the time of the killing was advancing in a threatening manner on the defendant, or occupied a menacing attitude towards him, or made the slightest move towards attack, or did any act indicating a present intent to do defendant great bodily harm, that in such cases evidence of prior threats by deceased against the prisoner, and communicated to him would be competent evidence to be weighed by the jury. The courts should be careful about excluding evidence of this character, and may do so only when there is an entire absence of such circumstances. If there is even slight evidence to indicate that the act of killing was done under a present, reasonable apprehension to himself of great bodily harm, prior threats should not be excluded.

*Id.* at 163, 13 P. 223.

■ In *Thomason* there was "no evidence whatever before the jury tending, in the slightest manner, to show a killing in self-defense." This case is different because there is evidence that the victim was advancing in a threatening way, and that the defendant was frightened. The *Thom-*

*ason* rule is consistent with the rule that when a valid self-defense claim is raised, the jury should be allowed to hear all of the evidence relating to a defendant's perception of the situation. *See State v. McCarter,* 93 N.M. 708, 604 P.2d 1242 (1980); 1 C. Torcia, *Wharton's Criminal Evidence,* § 236 (13th ed. 1972). The *Thomason* rule applies here.

The excluded evidence with respect to past events is also important because it concerns provocation. While *State v. Chavez* holds that one who provokes a confrontation is not entitled to a self-defense instruction, it presented a different situation. In *Chavez* the defendant entered a convenience store to commit an armed robbery. Provocation was not in dispute. Here, however, provocation is a question for the jury.

■ Provocation should not be confined to a narrow time frame. Instead, in proper cases, it should be viewed more broadly to include past acts of the victim because that evidence bears directly on the defendant's perception of danger. As stated in *State v. Wanrow,* 88 Wash.2d 221, 559 P.2d 548, 557 (1977):

Respondent's knowledge of the victim's reputation for aggressive acts was gained many hours before the killing and was based upon events which occurred over a period of years. Under the law of this state, the jury should have been allowed to consider this information in making the critical determination of the " 'degree of force which * * * a reasonable person in the same situation * * * seeing what [s]he sees and knowing what [s]he knows, then would believe to be necessary.

*See also State v. McCarter.*

■ In this case, not only was there evidence that over the years the victim had intimidated the defendant, but there was evidence that on the night of the killing, the defendant had gone to bed; that the victim, drunk, entered the bedroom and

**504**

was abusive; and that the victim, after being locked out of the house and then let back in, advanced on the defendant. The jury could find that the incident was provoked by the victim, not the defendant, and that the provocation began before the defendant pulled the gun.

In support of the trial court's ruling, the State has argued that the tendered evidence was properly excluded because the defendant's testimony conclusively established that she acted out of anger, not fear, and was the aggressor in the final encounter. Contrary to the State's assertions, however, the admitted evidence supports conflicting inferences of fear and anger as to the respective actions of the victim and the defendant in provoking the final encounter. The excluded evidence tended to support defendant's theory. Under the circumstances, it was error to exclude such evidence. *See State v. Brown,* 91 N.M. 320, 573 P.2d 675 (Ct.App.), *cert. quashed,* 91 N.M. 349, 573 P.2d 1204 (1977), *cert. denied,* 436 U.S. 928, 98 S.Ct. 2826, 56 L.Ed.2d 772 (1978).

We appreciate the trial judge's concern that in giving a self-defense instruction he would be condoning shootings by angry spouses under no threat of imminent harm. But we also believe that when a defendant has introduced evidence that he, or she, is about to be attacked, evidence concerning all of the relevant facts known to the defendant which affected his or her action should be considered by a jury. We hold that, under the facts of this case, the defendant was entitled to a self-defense instruction.

The conviction is reversed and remanded for a new trial.

Because of our disposition it is unnecessary to consider defendant's sentencing issue.

**IT IS SO ORDERED.**

BIVINS and MINZNER, JJ., concur.