830 P.2d 554

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Timothy DUNCAN, Defendant–Appellant.**

No. 10563.

Court of Appeals of New Mexico.

May 31, 1990.

**638**

Hal Stratton, Atty. Gen., Margaret McLean, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

J. Michael Norwood, UNM Clinical Law Program, Albuquerque, for defendant-appellant.

\* The following Court of Appeals opinion in *State v. Duncan* has been published merely to set forth the facts and issues addressed in the Supreme Court's opinion published at 111 N.M. 354.

OPINION *

APODACA, Judge.

Defendant appeals his jury convictions for aggravated burglary, kidnapping, false imprisonment, two counts of armed robbery, six counts of criminal sexual penetration (CSP) in the second degree, two counts of attempt to commit CSP in the second degree, and unlawful taking of a motor vehicle. He raises three issues on appeal: the trial court erred in (1) excluding the expert testimony of a psychologist concerning the character of the person defendant claimed coerced him, offered in connection with his defense of duress; (2) refusing defendant's requested jury instruction also relating to his defense; and (3) instructing the jury on the CSP charges where the evidence was insufficient to support the instruction. We reverse and remand for a new trial on the first issue, concluding the trial court's exclusion of the testimony denied defendant his defense of duress in that the coercer's character was an essential element of the defense.

We also address the second and third issues because they may arise again at a second trial. As to those issues, we affirm because we conclude the trial court did not err in refusing the tendered instruction and in instructing the jury on the CSP charges.

FACTS

A. *Factual Background*

Defendant met the primary victim (Polly) and her husband through a prison fellowship program while defendant was incarcerated at the Los Lunas Correctional Facility (the facility). Defendant temporarily stayed with Polly's family after he was released from the facility in 1985. Their friendship continued after defendant moved into his own place. Both Polly and defendant testified that defendant thought of Polly as a mother or grandmother. She would often assist him by arranging transportation and dental appointments. Ultimately, another inmate, Jim Wiggington, was released from the facility sometime in late July 1986.

Defendant has been in and out of correctional institutions most of his life. He first met Wiggington in 1980 while they were incarcerated at the state penitentiary in Santa Fe. Eventually both were transferred to the facility, where they continued to be friends. In both institutions, they appeared to have been living in the same unit and to have spent a good deal of time together.

Wiggington had bragged to defendant that he had killed people during the 1980 riot but had not been caught. Both of them, along with other inmates, spent a fair amount of time playing Dungeons and Dragons, a fantasy quest game. Most inmates played to pass the time; Wiggington, however, played to antagonize and intimidate. He also seemed to particularly enjoy bullying and intimidating defendant while playing the game. One of his tactics was to "discover" and "kill," in bizarre ways, members of defendant's imaginary family. Defendant was aware Wiggington received counseling at the facility. It was this counseling that gave rise to the expert testimony at issue in this appeal.

### B. *Facts Surrounding the Incident*

The charges against defendant grew out of an incident that occurred during the late night hours of August 5 and the early morning hours of August 6, 1986. Wiggington had been released about a week or ten days before the incident. Defendant had stored some boxes of Wiggington's personal belongings in Polly's garage. On July 30, 1986, defendant, Wiggington, and another former inmate went to Polly's home to get the boxes. Although they were there for only thirty minutes, they learned that Polly's husband would be away on the night of August 5.

On August 5, Wiggington picked up defendant at work. Instead of taking defendant home, Wiggington took him to a supermarket near Polly's house. He told defendant that they were going to play Dungeons and Dragons "for real" that night. He pulled a knife out of a satchel and told defendant he was going to use it to cut Polly's throat. Defendant protested, saying he loved Polly like a mother. Wiggington told defendant that if defendant went along, he would not have to kill Polly.

Defendant testified he accompanied Wiggington to prevent him from killing Polly and also because he feared Wiggington would kill him if he refused to go. Wiggington's use of the phrase "are you with me or against me," as well as his reference to the fact that he believed himself to be a magical person who would not be caught, reminded defendant of the way Wiggington had played Dungeons and Dragons. Defendant thought Wiggington was crazy, that he was extremely unstable, and that, if defendant refused to go with him, Wiggington would go alone and kill Polly.

At the supermarket, Wiggington told defendant to telephone Polly. Still possessing the knife, Wiggington was present when the call was made. Polly agreed to pick up defendant so he could spend the night at her house. When she arrived, Wiggington persuaded her to let him stay at the house also.

They arrived at Polly's home about 11:15 p.m. Polly went into her bedroom to get clean sheets, and Wiggington followed her. He immediately pulled the knife and told Polly he was going to rape and rob her. Throughout the course of the night, he forced her to commit various sexual acts. On several occasions during the night, at Wiggington's request, defendant brought coffee and cigarettes to Wiggington in the bedroom.

During the night, Wiggington told Polly he was possessed by two spirits, Dramasus and another whose name Polly could not remember. Wiggington considered himself a warlock who had sold his soul to the devil. The knife he was going to use to kill Polly had been dedicated on an altar for that purpose. Dramasus was mad at Polly because she had hung up the phone on Dramasus. Dramasus was also telling Wiggington to do terrible things to her because of her strong Christian faith.

Later, Wiggington attempted to murder Polly by suffocating her. He directed defendant to do the same to Paula, an exchange student living with Polly and her

husband. Paula also had been kept hostage during the night. Defendant did not do what Wiggington instructed. Instead, he eventually persuaded Wiggington to leave the two women alive. They then left with household belongings defendant had stacked in the living room during the night.

### SUMMARY OF TRIAL PROCEEDINGS

A brief summary of what occurred at trial will provide an understanding of how the testimony exclusion issue arose. Wiggington did not testify at trial. Thus, the facts regarding Wiggington and the incident were introduced through the testimony of Polly, Paula, and defendant. A psychologist called by defendant and a psychiatrist called by the state testified concerning defendant's psychological status. There was little, if any, conflict in the facts of the incident. Defendant's defense of duress was premised on two contentions: (1) he had gone along with Wiggington because he was afraid Wiggington would kill Polly if he did not; (2) he feared Wiggington would kill him also, if he did not do as Wiggington directed.

Before trial, the state had moved to exclude the testimony of defendant's two psychologists. The trial court reserved ruling on the motion until trial. At trial, the state renewed its motion and requested a ruling. The expert testimony of only one of the psychologists is at issue. The state represented the testimony as follows:

> [The psychologist's] sole purpose for testifying is that he knows ... Wiggington; ... he worked with [him] as a patient at Los Lunas; ... he believes that ... Wiggington is a very scary person. On one occasion he has seen ... Wiggington transform himself into a different physical appearance; ... he's changed the color of his skin and not through the use of make-up; and ... he's changed the shape of his face; and ... he believes ... Wiggington is a very frightening, ... menacing person.

Defendant later adopted this statement as his offer of proof, with the addition of the fact that the psychologist had been employed by the Corrections Department for seven years.

The state asserted that the expert testimony was about things "years ago." Defendant countered that the psychologist had treated Wiggington until he was released from the facility just a few days before the crime was committed. Relying on *State v. Bazan*, 90 N.M. 209, 561 P.2d 482 (Ct.App.1977), defendant argued the evidence was admissible under SCRA 1986, 11–405(B). He contended this case was one in which character or a trait of character of a person was an essential element of a charge, claim or defense. The trial court initially ruled the evidence was not relevant, but the discourse continued. The state again maintained that the physical transformation to which the psychologist would testify "preceded this incident by a considerable period of time." The trial court, apparently focusing only on the events that occurred on the night of the incident, finally concluded there was no evidence of a physical transformation of Wiggington on that night and disallowed the testimony as irrelevant.

### DISCUSSION

#### A. *Exclusion of Expert Testimony*

■ To hold that the trial court committed reversible error, we must conclude that the error affected a substantial right of defendant. SCRA 1986, 11–103(A). An accused has a fundamental right to present evidence of a defense as long as the evidence is relevant and is not excluded by an established evidentiary rule. *Commonwealth v. Greene*, 469 Pa. 399, 366 A.2d 234 (1976).

Defendant contends his prior experiences with Wiggington were relevant to the issue of duress and that Wiggington's character was an essential element of the defense. This argument is based in part on an analogy to self-defense cases, since there are presently no cases in New Mexico directly on point. Defendant also argues that the expert testimony was important to corroborate his own testimony, particularly concerning Wiggington's alter ego. As part of this argument, defendant contends the psychologist was prepared to testify concerning defendant's character, Wiggington's character, and the interaction between the

two. This contention, however, was not in the offer of proof, and therefore was not preserved for our review. We thus do not address it. In countering defendant's arguments, the state essentially contends the testimony was both irrelevant and constituted inadmissible character evidence under SCRA 1986, 11–404.

■ Relevance does not exist in a vacuum; instead, it is the logical relationship between evidence and a proposition in issue that the party seeks to prove. *Cf. State v. Martin*, 101 N.M. 595, 686 P.2d 937 (1984) (character evidence of defendant's prior husband found irrelevant, for it failed to show a logical connection to the crime charged). For this reason, it would be useful to consider what defendant was attempting to prove in support of his defense.

The elements of a duress defense are stated in the uniform jury instructions, SCRA 1986, 14–5130:

Evidence has been presented that the defendant was forced to .............. under threats. If the defendant feared immediate great bodily harm to himself or another person if he did not commit the crime and if a reasonable person would have acted in the same way under the circumstances, you must find the defendant not guilty.

The burden is on the state to prove beyond a reasonable doubt that the defendant did not act under such reasonable fear.

Relevant evidence is defined by the rules of evidence, SCRA 1986, 11–401, as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Additionally, SCRA 1986, 11–402 provides, "All relevant evidence is admissible, except as otherwise provided by constitution, by statute, by these rules or by other rules adopted by the supreme court."

■ Both parties represent that the specific issue in this appeal, that is, the relevance of psychological testimony concerning the coercer, has not been addressed in New Mexico. We agree. Yet, the few cases existing on the duress defense strongly suggest that the relationship between a defendant and the coercer is relevant in determining the existence of a threat, as well as its immediacy. *See, e.g., Esquibel v. State*, 91 N.M. 498, 576 P.2d 1129 (1978) (holding duress is a defense, and the evidence was sufficient to present a jury issue on the immediacy of the danger where there was a long history of beatings of defendant by guards and the most immediate episode was two to three days before defendant's escape from the penitentiary); *State v. Torres*, 99 N.M. 345, 657 P.2d 1194 (Ct.App.1983) (evidence that woman had been beaten by man she referred to as her common-law husband over a period of seven years, the last of which occurred two or three days before the crime, was sufficient to present question for the jury; trial court erred in instructing that husband had to be present in the store at the time of the fraud).

■ By analogy to the self-defense cases, defendant contends the character of the coercer is an element of the claim or defense. We agree. *See State v. Branchal*, 101 N.M. 498, 684 P.2d 1163 (Ct.App. 1984) (holding it was reversible error to exclude prior acts of the victim, in part because they bear directly on defendant's perception of danger); *State v. Melendez*, 97 N.M. 740, 643 P.2d 609 (Ct.App.1981), *rev'd on other grounds*, 97 N.M. 738, 643 P.2d 607 (1982) (specifically holding that evidence of the reputation of the victim is admissible as probative evidence of " 'an essential element of ... [self-] defense' ") *Cf. State v. Smith*, 92 N.M. 533, 591 P.2d 664 (1979) (no abuse of discretion to exclude evidence of the victim's drug habit in a first degree murder conviction). We note that, in *Bazan*, the defendant had not raised self-defense. For that reason, the character evidence at issue was treated as collateral rather than as an essential element of a claim or defense. Indeed, such evidence has been held admissible even if the defendant was unaware of the victim's character or reputation. *See State v. Mon-*

*toya,* 95 N.M. 433, 622 P.2d 1053 (Ct.App. 1981).

In the context of cases where self-defense was an issue, the exclusion of such evidence has been held to be reversible error, even if a defendant or other witnesses testified to the specific acts independently. *See State v. Ardoin,* 28 N.M. 641, 216 P. 1048 (1923) (reversible error to exclude evidence of prior specific acts of victim to third person, even though defendant testified victim had told him of the specific act); *State v. Chesher,* 22 N.M. 319, 161 P. 1108 (1916) (reversible error to exclude testimony by defendant's witnesses concerning a conversation between himself and the victim, even though defendant had testified to the conversation himself); *State v. Melendez* (reversible error to exclude testimony of police officers concerning reputation of victim, even though defendant had testified concerning reputation of victim); *State v. Elliott,* 96 N.M. 798, 635 P.2d 1001 (Ct. App.1981) (reversible error to exclude expert testimony concerning defendant's intent, even though lay witnesses have testified on the same issues); *State v. Brown,* 91 N.M. 320, 573 P.2d 675 (Ct.App.1977), *aff'd on other grounds,* 91 N.M. 349, 573 P.2d 1204, *cert. denied,* 436 U.S. 928, 98 S.Ct. 2826, 56 L.Ed.2d 772 (1978) (reversible error to exclude psychologist's testimony concerning defendant's fear of police, even though lay witnesses testified on the same issues).

■ We understand the state's argument on relevancy to be that, because the standard on the duress issue is an objective one, expert psychological testimony is not necessary or relevant. We need not decide whether this argument is a correct characterization of the standard. To be sure, the plain language of the jury instruction on duress suggests to us that the standard consists of both subjective and objective components: (1) did defendant in fact fear immediate great bodily harm?; if he did, (2) would a reasonable person have acted in the same way under the circumstances? In 2 P. Robinson, *Criminal Law Defenses* Section 177(d), (f) (1984), Robinson suggests that the first part of the standard is a

subjective rather than an objective test. *See also State v. Gallegos,* 104 N.M. 247, 719 P.2d 1268 (Ct.App.1986) (holding, in a self-defense case, that the standard has both subjective and objective components).

■ In their respective briefs, the parties have discussed the various factors considered in assessing the objective aspect of the defense of duress. Additionally, both parties rely on Robinson's treatise as authority, and among the factors cited by Robinson as appropriate to be considered is the apparent likelihood of execution of the threat. From a strictly practical point of view, it would appear that the character of a defendant and of the alleged coercer, including their respective psychological makeup, are relevant to the issue of the likelihood of the execution of the threat.

We believe defendant's purpose in introducing the expert testimony was to prove the gravity of the threat in connection with his defense of duress. Evidence bearing on the question of aggression and on defendant's reasonable apprehension are material and relevant. *See State v. Ardoin* (the court found reversible error in the exclusion of victim's prior violent acts in defendant's claim of self-defense). Based on our discussion, we hold that the expert testimony was relevant.

■ The state contends the expert testimony was not admissible under any of the exceptions under Rule 11–404, even if we determined it was relevant. However, in *Bazan,* we held that, where character is an element of the crime, claim or defense, testimony of such character is relevant. As such, that evidence is not prohibited under Rule 11–404 and is admissible under Rule 11–402. *State v. Bazan.* Such character evidence may be proved by three methods: (1) reputation; (2) opinion; or (3) specific instances of conduct. *Id.* Obviously, the expert testimony at issue here encompasses one of these methods. Our inquiry is not completed, however.

Having determined that the expert testimony was relevant under Rule 11–401 and admissible under Rule 11–402, the only question remaining is whether the trial court could have excluded it under SCRA

1986, Rule 11–403, which provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

■ We hold that the expert testimony was not excludible under Rule 11–403. Exclusion for "unfair prejudice" involves an undue tendency to suggest a decision on an improper basis, usually on emotions. *See* 28 U.S.C.A. R. 403 note 189, at 191. We fail to see how the expert testimony would have injected an emotional element into the trial proceedings. Instead, the psychological evidence could have afforded the jury a further explanation of the rather bizarre events that transpired on the night of the incident. Neither was the proffered testimony misleading nor confusing, since it tended to identify, explain or corroborate the fear and threat testified to by defendant and the immediacy of the threat. Finally, the testimony was not cumulative and would not have unduly delayed the trial. On the contrary, defendant was entitled to buttress his testimony concerning his fear of Wiggington, as well as to explain Wiggington's actions on the night of the incident. Defendant should not be expected to depend solely on Polly's and Paula's testimony, which was a part of the state's case, for this purpose.

The state relies on *State v. LeMarr*, 83 N.M. 18, 487 P.2d 1088 (1971), contending there is a factual similarity between that case and this appeal. In *LeMarr*, our supreme court held that the trial court had properly refused the defendant's jury instruction on duress, where the evidence showed: (1) the coercer threatened the defendant with a knife but later handed the knife to the defendant; and (2) the defendant had several opportunities to escape. The state argues that in this case, like in *LeMarr*, defendant had a number of opportunities to escape.

We reject the state's argument for two reasons. First, this court has held that *LeMarr* was not to be read literally on the issue of the immediacy of the compulsion, given the holding of *Esquibel* that the issue of immediacy is a question of fact. *State v. Torres*, 99 N.M. at 347, 657 P.2d at 1196. Second, *LeMarr* is factually distinguishable. There, the defendant argued he was compelled by threats against himself. Here, the evidence indicated that defendant was concerned not only for himself but for Polly. He specifically testified he went along in order to prevent Wiggington from killing Polly. When the fear is for a third person, it would seem that opportunities for a defendant to escape are less compelling on the issue of immediacy.

■ The state further argues that expert testimony was not "necessary" and that defendant's testimony, as well as Polly's and Paula's testimony, was "sufficient" to provide the jury with a "reasonable basis" from which it could decide defendant's duress claim. The state also claims that defendant could have called Wiggington as a witness. We believe this argument begs the question and consequently fails. Polly had met Wiggington only once before, for thirty minutes. Paula never had. Wiggington had invoked his fifth amendment right against self-incrimination and refused to testify. As noted in *Melendez, Chesher,* and *Ardoin,* in a case involving this kind of defense, the credibility of a defendant is on the line. For that reason, it is extremely important that he be allowed to buttress his testimony through the testimony of other disinterested witnesses. *See also State v. Elliott* (suggesting the issue is not whether the testimony is necessary, but whether it is properly admissible).

We realize it is entirely possible that the jury may have chosen to reject the expert testimony, in any event. That may be, but that is not the issue. Defendant was nonetheless entitled to present the testimony as a part of his defense of duress. We thus conclude that the trial court committed reversible error in excluding the testimony.

**B.** *Refusal of Jury Instruction*

Defendant contends the trial court erred in refusing his requested instruction con-

cerning the lack of a duty to prevent commission of a crime. The instruction read as follows:

> For criminal liability to be based upon a failure to act, there must be a duty to act—a legal duty and not simply a moral duty. One has no legal duty to aid another person in peril, even when that aid can be rendered without danger or inconvenience to himself.

As authority, the instruction cited W. LaFave & A. Scott, *Criminal Law* Section 26, at 183 (1972) and *People v. Beardsley*, 150 Mich. 206, 113 N.W. 1128 (1907).

Defendant draws our attention to the procedural context of the request for the instruction and its refusal. During cross-examination, the state asked defendant a series of questions emphasizing the affirmative steps defendant could have taken to prevent commission of the crime. For example, defendant, Wiggington and Polly walked into Polly's home through the garage, where a broom and tools were located on a shelf. The state asked defendant if he had attempted to pick up any of these objects to hit Wiggington. Defendant immediately objected, contending there was no duty in Anglo–American law to prevent a crime and that the examination deprived defendant of due process. Defendant then requested the trial court to instruct the jury that defendant was not under a duty to prevent a crime. The court denied an oral instruction to the jury at that time but informed defendant it would be included in the instructions given to the jury later, and defendant could request such an instruction then. At the conclusion of the trial, defendant proffered the written instruction, which was also denied.

Defendant argues the jury "was unable to make an informed decision on the question of duress" because of the trial court's failure to give the instruction. He distinguishes between cross-examination dealing with opportunities to escape, which he concedes is relevant, and cross-examination implying defendant should have taken affirmative steps to stop the sequence of events. We interpret defendant's argument as contending that, without the instruction, the jury may have misunderstood the law on duress. Although the state appears to believe that defendant objected to the refusal of not one but two instructions (the other one concerning aiding and abetting), we do not view defendant's contention as such.

 Jury instructions must be read as a whole, and, when so considered, if they fairly and correctly present the law, nothing more is required. *State v. Fields*, 74 N.M. 559, 395 P.2d 908 (1964). Additionally, since adoption of the uniform jury instructions, trial courts are required to give them without substantive modifications or substitution. *State v. Blakley*, 90 N.M. 744, 568 P.2d 270 (Ct.App.1977). In *Blakley*, the defendant was convicted of vehicular homicide while driving recklessly. The trial court gave the uniform jury instructions on the crime but refused to give the defendant's requested instruction defining reckless driving. The trial court also refused to give a uniform jury instruction defining willful and wanton conduct. This court upheld the trial court on both issues, holding that the trial court must give instructions as directed by the supreme court without substantive modifications or substitution. *See also State v. Sparks*, 102 N.M. 317, 694 P.2d 1382 (Ct.App.1985) (if the subject matter is adequately covered in the instructions, a requested jury instruction is properly refused); *State v. Beal*, 86 N.M. 335, 524 P.2d 198 (Ct.App.1974) (instructions should be read as a whole, and where other instructions adequately cover the issue, refusal to give a separate instruction is not error). Thus, the issue on appeal is narrowed to the question of whether the instructions given here adequately defined the crime.

 On the whole, we believe the trial court correctly refused the requested instruction. Even if we assume there is no legal duty to act to prevent a crime, that is not the issue. The issue is whether the jury was adequately instructed on the duress defense. Since the trial court used the uniform jury instruction without substantive modification, we must conclude that the jury was adequately instructed.

## C. *Sufficiency of the Evidence to Instruct on CSP*

Pursuant to *State v. Franklin*, 78 N.M. 127, 428 P.2d 982 (1967), and *State v. Boyer*, 103 N.M. 655, 712 P.2d 1 (Ct.App. 1985), defendant argues there was not sufficient evidence to warrant instructing on CSP. An instruction on a criminal charge is warranted if it is supported by substantial evidence. *Cf. State v. Mosley*, 75 N.M. 348, 404 P.2d 304 (1965) (court not required to charge jury on defendant's theory of the case unless it is supported by substantial evidence); *State v. Lara*, 109 N.M. 294, 784 P.2d 1037 (Ct.App.1989) (defendant entitled to self-defense instruction if there is evidence to support it); *State v. Armijo*, 90 N.M. 614, 566 P.2d 1152 (Ct.App.1977) (defendant entitled to instruction on lesser offense if some evidence tending to establish it). It is the jury's duty to determine the weight and sufficiency of the evidence, including all reasonable inferences. *State v. Vialpando*, 93 N.M. 289, 599 P.2d 1086 (Ct.App.1979). Applying these standards to the facts of this appeal, we believe that the evidence reviewed below, although admittedly circumstantial, was sufficient to support the instructions on CSP.

Defendant himself never assaulted Polly sexually. Nor was that the state's contention. Instead, the jury was instructed it could convict defendant if he aided and abetted Wiggington in the commission of the CSP. This required a showing that defendant intended the crimes to be committed and helped, encouraged, or caused their commission. SCRA 1986, 14–2822. We proceed to review the evidence with this premise in mind.

Defendant placed the original call to Polly. Shortly after entering the house, he went into Polly's bedroom and saw her partially naked on the bed with Wiggington. While there was a fair amount of moving around during the six or seven hours defendant and Wiggington were in the house, it was clear that Wiggington and Polly were spending a lot of time in the bedroom. Defendant entered the bedroom a number of times to bring Wiggington coffee and cigarettes. Defendant had a knife in his belt during some part of the night. Although the testimony was not clear as to whether defendant had a knife in his belt on one or more of the occasions when he went into the bedroom, the jury could infer that he did.

At some point, defendant was asked by both Polly and Paula whether he had participated in planning the crimes. Both questions referred generally to the crimes, not to the specific crimes of CSP, but the jury could infer that the questions referred to all crimes committed that night. Defendant's testimony at trial explained his failure to deny planning the crimes in response to Polly's and Paula's inquiries, but the jury was entitled to disbelieve his explanation.

Defendant essentially argues that all the evidence against him was circumstantial. However, circumstantial evidence alone can be sufficient to prove guilt beyond a reasonable doubt. *See State v. Brown*, 100 N.M. 726, 676 P.2d 253 (1984); *State v. Duran*, 86 N.M. 594, 526 P.2d 188 (Ct.App.1974) (circumstantial evidence can be sufficient to sustain a conviction); SCRA 1986, 14–5001. Additionally, he contends that even the evidence concerning his planning of the crime with Wiggington, which he denied, goes only to the planning of the robbery, not CSP. He contends further that presence, even with mental approbation, is not, in itself, sufficient to support a conviction, unless it is accompanied by some outward manifestation or expression of approval. *State v. Luna*, 92 N.M. 680, 594 P.2d 340 (Ct.App.1979).

Defendant also argues that the aider and abettor must share the criminal intent of the principal. *See State v. Harrison*, 81 N.M. 324, 466 P.2d 890 (Ct.App. 1970). We would have viewed this a more compelling argument in connection with a different crime. However, CSP does not require a specific intent. *See State v. Ramirez*, 84 N.M. 166, 500 P.2d 451 (Ct.App. 1972) (decided under former law). In a general intent crime, the only intent required is one of conscious wrongdoing. *See State v. Mascarenas*, 86 N.M. 692, 526 P.2d 1285 (Ct.App.1974).

On the whole, the jury was entitled to infer that defendant was well aware of the repeated CSP perpetrated throughout the night. We believe that this knowledge, coupled with defendant's actions of bringing Wiggington coffee and cigarettes, possibly while defendant was armed with a knife, and the evidence concerning planning the crimes in advance, met the test of sufficiency. From this evidence, the jury could have concluded and inferred that defendant intended the crimes to be committed, and that he helped, encouraged or caused their commission. The admission of the jury instructions was proper.

CONCLUSION

In summary, we hold that the exclusion of the expert testimony denied defendant his defense of duress in that Wiggington's character was an essential element of the defense. We therefore reverse defendant's convictions under Issue 1 and remand for a new trial. We affirm the trial court on Issues 2 and 3.

IT IS SO ORDERED.

BIVINS, C.J., and ALARID, J., concur.