2002-NMCA-033

42 P.3d 272

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Joseph Lucas MANTELLI,
Defendant–Appellant.**

No. 21,464.

Court of Appeals of New Mexico.

Jan. 29, 2002.

Certiorari Denied, No. 27,368,
March 7, 2002.

Patricia A. Madrid, Attorney General, Max Shepherd, Assistant Attorney General, Santa Fe, NM, for Appellee.

Gerald E. Baca, Las Vegas, NM, Joe M. Romero, Jr., Scott D. Johnson, Albuquerque, NM, for Appellant.

## OPINION

BUSTAMANTE, Judge.

{1} Joseph Mantelli (Defendant), a police officer, appeals his conviction for voluntary manslaughter, aggravated assault with a deadly weapon (a firearm), and shooting at a motor vehicle resulting in injury. Defendant argues the trial court erred by: (1) refusing to change venue, (2) refusing to honor Defendant's peremptory notice of excusal of the trial judge, (3) denying Defendant's motion to exclude certain expert testimony offered by the State, (4) failing to instruct the jury on an essential element of shooting at a motor vehicle, (5) refusing to instruct the jury on justifiable homicide by a police officer, and (6) sustaining Defendant's conviction for voluntary manslaughter and aggravated assault

because insufficient evidence supported the convictions.

{2} Concluding that Defendant was entitled to have the jury instructed on justifiable homicide by a police officer in accordance with NMSA 1978, § 30–2–6 (1989), we reverse Defendant's convictions and take this opportunity to discuss the use of deadly force by police officers in New Mexico. We also address the remaining issues—with the exception of Defendant's motion to exclude certain expert testimony which is unlikely to recur—and remand for a new trial.

## I. FACTS

{3} Defendant, a uniformed officer with the Las Vegas, New Mexico Police Department (LVPD), shot and killed Abelino Montoya, an eighteen-year-old Robertson High School senior, in the early morning hours of February 14, 1998. At trial Defendant testified that while on duty, wearing his uniform and patrolling in a marked police unit with Sergeant Steve Marquez (Sgt. Marquez), the officers spotted a white Toyota truck near the Las Vegas City Plaza. They believed this was the same vehicle that earlier that night was going the wrong way on a one-way street, causing Sgt. Marquez to swerve to avoid a collision. The truck, driven by Montoya, had in fact eluded Sgt. Marquez after a brief chase that ended when Sgt. Marquez's marked police unit became disabled.

{4} Defendant activated the overhead lights and wig-wag lights on the police unit and moved to get behind the truck. Defendant testified that Montoya reacted to the lights by increasing his speed, and proceeding through an intersection without stopping for a stop signal. During the course of the pursuit, Montoya ran through six or seven stop signs, eventually reaching a dead-end at Valley and Chavez Streets.

{5} What occurred next was disputed at trial. Gabriel Rubio, a passenger in Montoya's truck throughout the evening, testified for the State. Rubio testified that Montoya, in an attempt to avoid being stopped, drove north on Valley Street, which dead-ends at Chavez Street. Montoya apparently was not aware that Valley Street came to a dead-end until he was in the intersection of Valley and Chavez Streets. Once in the intersection Montoya slammed on his brakes and the truck skidded at least a car length past the intersection. Rubio was watching the police car coming at them. Meanwhile, Montoya had put the truck in reverse and was backing up trying to position the truck to avoid a rock wall at the intersection as he attempted to turn the truck onto Chavez Street. Rubio testified the two vehicles collided in the middle of the intersection of Valley and Chavez.

{6} Once the two vehicles collided, Rubio testified that Defendant seemed to immediately be at the driver's side window trying to break the window with the butt of his handgun. At the same time Montoya was shifting the manual transmission of the truck out of reverse and turning the wheel to the right in a continuing attempt to turn down Chavez Street. While they were still in the middle of the intersection, Defendant succeeded in breaking the driver's side window. Montoya put the truck into first gear and began to drive away, going up and over the curb. He had to drive slowly as he turned right down Chavez Street to avoid the rock wall at the intersection. After clearing the wall, Montoya drove the truck fast down Chavez Street. As they were driving away, Rubio heard two shots. With one shot Rubio felt something graze his head and he ducked. He also told Montoya to stop. Rubio described the shots as coming one right after the other. After the shots rang out, the truck went out of control and hit the side of a house some distance down Chavez Street. Montoya suffered one shot in the back and a second in the head, killing him almost instantly. Rubio testified that he did not think that he and Montoya had ever put any officer's life in danger.

{7} The dispatcher tape-recorded Sgt. Marquez's calls as the second chase proceeded. The tape included the sound of the crash at the intersection of Valley and Chavez, and fifteen seconds later Sgt. Marquez saying "shots fired," and forty-one seconds from the crash Sgt. Marquez announcing that there was a death.

{8} The State's theory at trial was that Defendant shot Montoya to prevent him from

escaping. The State also presented testimony from Defendant's roommate, Adrian Crispin, a fellow LVPD officer, that Defendant told him right after the shooting that he had shot at the truck as it was moving away because it was about to get away.

{9} At trial Defendant testified to a different reason for the shooting. Defendant testified he believed at the time of the shooting that the truck was being used as a deadly weapon to attack him and Sgt. Marquez, that their lives were in danger, and that he was therefore justified in using deadly force in self-defense and defense of another.

{10} Defendant testified that he positioned his police car to try to "block-in" the truck so that it could not escape. On cross-examination, Defendant also admitted that he was aware of department policy that an officer was not to use his patrol car as a roadblock without ensuring the pursued vehicle had a way out of the roadblock. Defendant testified that he was shocked and scared when Montoya began to back up the truck. Defendant believed that Sgt. Marquez had exited the police car and then had been knocked down and possibly run over and killed or injured. Thus, standing an arm's length away from the truck, Defendant fired one round into the truck because he believed that his partner was in danger. He fired two more shots to the back of the truck because he thought the truck was backing up a second time to ram them again, and not because Montoya was trying to escape by negotiating the rock wall at the corner of Chavez and Valley. Sgt. Marquez also fired a single shot at the truck.

## II. JURY INSTRUCTION ON JUSTIFIABLE HOMICIDE BY A POLICE OFFICER

### a. Background

{11} Defendant argues that it was reversible error for the trial court to refuse to instruct the jury on justifiable homicide by a police officer in accordance with Section 30–2–6. Defendant requested one modified uniform jury instruction, based on UJI 14–5173 NMRA 2001, and three non-uniform instructions premised upon the United States Su-

preme Court decision in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), which related to justifiable homicide by a police officer. The State does not argue that the requested instructions were incorrect statements of the law.

{12} Defendant asserted that as a commissioned police officer in the line of duty for the LVPD, he was authorized to use deadly force under Section 30–2–6 to apprehend a fleeing felon who had threatened him and Sgt. Marquez with serious harm or deadly force and the jury should have been allowed to consider this defense under proper instructions. Defendant asserts that instructions on this theory specifically applicable to police officers would have allowed him to argue additional and alternative theories of justification for the shooting which went beyond the normal self-defense and defense-of-others theories applicable to the public at large.

{13} The State has never disputed that Defendant was a commissioned police officer and on-duty for the LVPD at the time of the shooting, and that he was justified in pursuing and attempting to apprehend Montoya. However, it argues that *State v. Johnson*, 1998–NMCA–019, 124 N.M. 647, 954 P.2d 79, requires a defendant requesting a justifiable homicide instruction to establish that his conduct satisfied a standard of "objective reasonableness" for the use of the deadly force prior to receiving such an instruction. *Id.* ¶ 13. The State contends that Defendant's actions in shooting at Montoya as he fled, exceeded Defendant's authority under Section 30–2–6 to use deadly force and cannot be considered reasonable as a matter of law. The State dramatized this point to the jury in its closing argument by repeatedly stating that police officers in New Mexico are not allowed to "shoot at a fleeing suspect."

{14} The State also argues that Defendant did not present evidence that he shot Montoya in an attempt to arrest him for committing a felony per Section 30–2–6. Instead, it argues that under Defendant's version of events, the proper instruction was that the killing was justified as occurring in self-defense or defense of another and not "necessarily committed" in order to prevent the escape of a felon. Defendant was granted

the UJI 14–5171 NMRA 2001 self-defense instruction.

{15} The trial judge, persuaded by the State's arguments, refused to instruct the jury on justifiable homicide because sufficient evidence was not presented by Defendant for the court to believe that Defendant's actions could be considered objectively reasonable. At the hearing on Defendant's motion for a new trial, the trial judge also explained that he believed Defendant's theory was self-defense and defense of another and that he had not argued that the killing of Montoya was justifiable homicide.

### b. Standard of Review

{16} The trial court's rejection of Defendant's submitted jury instructions is reviewed by this Court de novo. *State v. Lucero*, 1998–NMSC–044, ¶ 5, 126 N.M. 552, 972 P.2d 1143. A "defendant is entitled to a jury instruction on the theory of his case as long as the evidence exists to support it" which is sufficient to allow reasonable minds to differ with respect to all elements of the defense. *State v. Arias*, 115 N.M. 93, 96, 847 P.2d 327, 330 (Ct.App.1993). This is true whether the evidence raising the defense is adduced by the State or by defendant. *State v. Akin*, 75 N.M. 308, 310, 404 P.2d 134, 136 (1965); *State v. Heisler*, 58 N.M. 446, 454, 272 P.2d 660, 665 (1954). "The adequacy of a jury instruction is evaluated in the context of all the instructions given to the jury, in order to determine whether the instruction accurately states the law." *State v. Sosa*, 1997–NMSC–032, ¶ 25, 123 N.M. 564, 943 P.2d 1017.

### c. Use of Deadly Force and *Tennessee v. Garner*

{17} The use of deadly force by police officers to prevent the escape of a felony suspect originated in the common law. The common law rule "allowed the use of whatever force was necessary to effect the arrest of a fleeing felon, though not a misdemeanant." *Garner*, 471 U.S. at 12, 105 S.Ct. 1694. Under the common law rule, which New Mexico accepted for much of its history, the reasonableness and necessity of the officer's resort to deadly force was frequently judged solely on the basis of whether the officer could have arrested the suspect without shooting him. *Alaniz v. Funk*, 69 N.M. 164, 166–67, 364 P.2d 1033, 1034 (1961). Under this approach, it made no difference that the felon was nonviolent or that the felon posed no danger to the safety of others.

{18} In *Garner*, the father of Edward Garner, a fifteen-year-old boy who was shot and killed by a police officer while fleeing from the burglary of an unoccupied house, brought a wrongful death action under the Federal Civil Rights Act, 42 U.S.C. § 1983, against the police officer who fired the shot, the police department, as well as others. *Garner*, 471 U.S. at 5, 105 S.Ct. 1694. The shooting occurred after the officer responded to a report of a nighttime burglary and saw Garner running across the backyard of the house to a six-foot-high chain-link fence. *Id.* at 3, ·105 S.Ct. 1694. The officer, using a flashlight, saw Garner's face and hands, but saw no sign of a weapon. *Id.* When Garner began to climb over the fence after the officer's warning to halt, the officer shot and mortally wounded him. *Id.* at 4, 105 S.Ct. 1694. The officer testified that if Garner would have successfully scaled the fence he would have escaped capture. *Id.* at 4 n. 3, 105 S.Ct. 1694.

{19} In using deadly force, the officer acted in accordance with a Tennessee statute permitting the use of deadly force to effect the arrest of a felon fleeing from or resisting arrest. *Id.* at 4, 105 S.Ct. 1694. The statute reflected the common law fleeing-felon doctrine. However, the Supreme Court in *Garner* held that a police officer may not use deadly force to apprehend a fleeing felon who does not pose a "significant threat of death or serious physical injury to the officer or others." *Id.* at 3, 105 S.Ct. 1694. The Supreme Court reasoned that apprehension using deadly force is a "seizure" subject to the reasonableness requirement of the Fourth Amendment of the United States Constitution, and that the indiscriminate use of deadly force to prevent escape of all felony suspects is constitutionally impermissible. *Id.* at 7, 105 S.Ct. 1694. Almost all of the states have modified their police deadly force laws and policies in response to *Garner. See gen-*

erally "Police Use of Deadly Force: How Courts and Policy–Makers Have Misapplied Tennessee v. Garner." 7 Kan. J.L. & Pub. Pol'y 100 (1998).

{20} The Court explained that in determining whether a deadly-force seizure is reasonable, the suspect's rights under the Fourth Amendment had to be balanced against the government's interests in effective law enforcement. *Garner*, 471 U.S. at 9, 105 S.Ct. 1694. The factors that weigh heavily against the use of deadly force are "[t]he suspect's fundamental interest in his own life," the unmatched "intrusiveness of a seizure by means of deadly force," and "the interest of the individual, and of society, in judicial determination of guilt and punishment," which is frustrated by the use of deadly force. *Id.* The Supreme Court found that these factors outweigh the government's interest in the use or threat of use of deadly force to encourage suspects to submit peacefully to arrest. Thus, "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Id.* at 11, 105 S.Ct. 1694. The Court framed the inquiry as one designed to determine "whether the totality of the circumstances justified a particular sort of search or seizure." *Id.* at 8–9, 105 S.Ct. 1694.

{21} While the Court held that "[t]he Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against such [unarmed and non-dangerous] fleeing suspects," the Court also held that the statute was not unconstitutional on its face. *Id.* at 11, 105 S.Ct. 1694. The Court stated "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not unconstitutionally unreasonable to prevent escape by using deadly force." *Id.* Thus, it should be clear that under *Garner* the constitutionality of deadly force statutes should not be considered in the abstract; instead, courts should focus on the constitutionality of specific applications of a challenged statute to specific factual circumstances. Finally, *Garner* rejected the felony-misdemeanor distinction as a guide for deciding when deadly force may be used.

{22} In *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Court clarified its holding in *Garner* and ruled that excessive force claims brought against police officers are to be analyzed under the "objective reasonableness" standard of the Fourth Amendment. The Court cautioned that the "proper application" of this reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. With these facts and circumstances in mind, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The Court emphasized that this is an objective standard "without regard to [the actual officer's] underlying intent or motivation." *Id.* at 387, 109 S.Ct. 1865.

### d. Section 30–2–6

{23} Section 30–2–6, "Justifiable homicide by public officer or public employee," has evolved in response to the Supreme Court's pronouncements on the use of deadly force by law enforcement officers. (Emphasis omitted.) Specifically, the Legislature added Section 30–2–6(B), in response to *Garner*. *Johnson*, 1998–NMCA–019, ¶ 11, 124 N.M. 647, 954 P.2d 79. Section 30–2–6 provides in pertinent part:

A. Homicide is justifiable when committed by a public officer or public employee or those acting by their command and in their aid and assistance:

. . . .

(2) when necessarily committed in overcoming actual resistance to the execution of some legal process or to the discharge of any other legal duty;

(3) when necessarily committed in retaking felons who have been rescued or who have escaped or when necessarily committed in arresting felons fleeing from justice; or

(4) when necessarily committed in order to prevent the escape of a felon from any place of lawful custody or confinement.

B. For the purposes of this section, homicide is necessarily committed when a public officer or public employee has probable cause to believe he or another is threatened with serious harm or deadly force while performing those lawful duties described in this section. Whenever feasible, a public officer or employee should give warning prior to using deadly force.

Section 30–2–6(B) requirement that a homicide be "necessarily committed" places a limit on the use of deadly force by law enforcement officers in New Mexico that was envisioned in *Garner*.[1]

{24} In remarkably similar language, the *Garner* court stated:

Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Garner*, 471 U.S. at 11–12, 105 S.Ct. 1694.

{25} Under Section 30–2–6, the crucial consideration is the conduct and dangerousness of the suspect, not the classification of the crime that he or she has committed or is alleged to have committed. It is also apparent, through the inclusion of "probable cause" in Section 30–2–6(B), that the reasonableness of an individual police officer's actions is an objective analysis evaluated from his perspective at the time of the incident and is necessarily a factual inquiry.

{26} We discussed extensively the use of deadly force under Section 30–2–6 in *Johnson*, even though *Johnson* itself involved New Mexico's statute on justifiable homicide by a private citizen, NMSA 1978, § 30–2–7(C) (1963). In *Johnson*, the defendant—a private citizen—shot and killed a man he had observed fleeing from a parking lot where a vehicle had just been burglarized. The defendant never asserted he acted in self-defense. *Johnson*, 1998–NMCA–019, ¶ 2, 124 N.M. 647, 954 P.2d 79. The defendant pled guilty to involuntary manslaughter reserving the right to appeal the district court's refusal to give a justifiable homicide instruction. The instruction would have permitted the jury to consider whether the death of the victim was justified if the defendant was attempting to make a citizen's arrest of a fleeing felon. *Id.* ¶ 3.

{27} This Court upheld the trial judge's denial of the jury instruction on justifiable homicide on the grounds that there was no evidence the defendant could have satisfied the reasonableness standard for use of deadly force by a citizen in the apprehension of a fleeing felon. *Id.* ¶ 28. We noted that the "reasonableness in the use of force is generally, [but not always], a matter for the jury," *id.* ¶ 16, by analogizing the statute in question with Section 30–2–6, and stated that "Defendant's actions, if performed by a police officer, would never be tolerated." *Id.* ¶ 12. We observed that the *Garner* decision had wrought a change in New Mexico law on the use of deadly force, noting that the Supreme Court "required that officers have probable cause to believe that they or others are threatened with serious harm before the use of deadly force could be constitutionally reasonable under the Fourth Amendment." *Johnson*, 1998–NMCA–019, ¶ 8, 124 N.M. 647, 954 P.2d 79.

{28} Similarly, in *Archuleta v. LaCuesta*, 1999–NMCA–113, 128 N.M. 13, 988 P.2d 883, we discussed the issue of the use of deadly force by police officers in the context of a tort action. The case involved a suit for wrongful death, brought under 42 U.S.C. § 1983 (1994) and the State Tort Claims Act, NMSA 1978, §§ 41–4–1 to –27 (1976 as amended through 2001), by the estate of a domestic violence suspect who was shot and killed by a state police officer. *Archuleta*,

---

1. While Section 30–2–6 speaks of justifiable homicide, we read it as authorizing the use of deadly force by law enforcement officers whether or not the suspect is ultimately killed. *Graham*, 490 U.S. at 395, 109 S.Ct. 1865 ("All claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest . . . of a free citizen should be analyzed under the Fourth Amendment and its '[objective] reasonableness' standard.") (emphasis omitted).

1999–NMCA–113, ¶ 2, 128 N.M. 13, 988 P.2d 883.

{29} In *Archuleta*, this Court stated:

Whether an officer's [use of deadly force] was reasonable is heavily fact dependent. The reasonableness of the use of deadly force in any particular situation is an objective test from the perspective of the officer on the scene, with the understanding that officers must often make split-second decisions in difficult situations about what force is necessary.

*Id.* ¶ 8 (citations omitted). We held that the "reasonableness" of the force used in the case involved a factual dispute "surrounding the circumstances immediately connected to the shooting which includes passing on the credibility of witnesses," and should therefore be decided by the jury. *Id.* ¶ 14.

{30} The *Johnson* Court's discussion of Section 30–2–6, despite being dicta, and the *Archuleta* Court's announcements on the use of deadly force provide a framework to evaluate the issue presented in this case.

**e. Discussion**

{31} The crux of this issue is whether a jury could find that Defendant had probable cause to believe Montoya posed a threat of serious harm or deadly force to him or Sgt. Marquez, and that the use of deadly force was necessary to avert the threat. In order to be entitled to a jury instruction on justifiable homicide, Defendant was required to introduce or identify evidence that would support an argument that he reasonably and objectively believed that Montoya threatened him or Sgt. Marquez with serious physical harm or deadly force. If such evidence was present it was for the jury to decide if Defendant's use of deadly force was reasonable, considering the totality of the circumstances, and therefore constituted justifiable homicide. *See Johnson*, 1998–NMCA–019, ¶ 16, 124 N.M. 647, 954 P.2d 79.

{32} In *State v. Lopez*, 2000–NMSC–003, ¶ 23, 128 N.M. 410, 993 P.2d 727, (quoting *State v. Duarte*, 121 N.M. 553, 556, 915 P.2d 309, 312 (Ct.App.1996)), our Supreme Court clearly stated the standard to be applied by the trial court in ruling whether a request for

an instruction on a claim of self-defense or defense of another should be granted. The Court stated:

"[W]here self-defense is involved in a criminal case and there is any evidence, although slight, to establish [such defense], it is not only proper for the court, but its duty as well, to instruct the jury fully and clearly on all phases of the law on [that] issue." ... However, we interpret this standard to require evidence that is "sufficient to allow reasonable minds to differ as to all elements of the defense." We affirm [*State v.*] *Branchal* [101 N.M. 498, 684 P.2d 1163 (Ct.App.1984) ]: a self defense instruction is required "whenever a defendant presents evidence sufficient to allow reasonable minds to differ as to all elements of the defense."

*Id.* (citations omitted). This is also the standard that should be applied when determining if the jury should be instructed on justifiable homicide by a police officer in accordance with Section 30–2–6. We also note that the identity of the party introducing the evidence, Defendant or the State, is irrelevant. *Akin*, 75 N.M. at 310, 404 P.2d at 136; *Heisler*, 58 N.M. at 454, 272 P.2d at 665. What is important is that the evidence was presented to the jury.

{33} Defendant, a commissioned police officer on duty for the LVPD, was pursuing Montoya with Sgt. Marquez. The prosecution's case, as discussed above, was premised on the theory that Montoya was fleeing the scene in order to evade capture. In fact, the State's closing argument began with the assertion that "[w]e do not shoot at a fleeing suspect" because to do so would be against the law. The State argued that if the physical evidence showed Montoya was not in the process of backing up the Toyota in the direction of Defendant and Sgt. Marquez at the time of the shooting, the jury must convict because under such a scenario Defendant could not have acted in self-defense or defense of another. The State characterized Defendant's theory of self-defense and defense of another as a "backward attack theory" which was not supported by the physical evidence that suggested that Montoya had

cleared the rock wall and had begun to flee down Chavez Street.

{34} Defendant testified that, upon arrival at the intersection of Valley and Chavez Streets, he positioned his police cruiser to execute a "felony stop." He also testified that the Toyota truck began to accelerate in reverse toward the officers and that there was an impact between the two vehicles.

{35} Defendant testified that he was shocked and scared by the driver's actions. Defendant then testified that he drew his weapon, ran up to the side of the truck on the driver's side door, planning to pull the driver out of the truck. Sgt. Marquez instructed Defendant to "stop him, stop him" multiple times. Defendant testified that during this time he lost sight of Sgt. Marquez and that he thought Marquez had exited the police cruiser, had been knocked down and possibly run over and killed or injured. In response, standing an arm's length away from the truck, Defendant testified he fired one round into the truck. After he fired the first round, believing that the truck was coming back to ram them again, he testified he fired two more rounds into the back of the truck. Sgt. Marquez also fired a single shot at the truck.

{36} Defendant testified his belief at the time was that the truck was being used as a deadly weapon to attack him and Sgt. Marquez, that their lives were in danger, and that he was therefore justified in using deadly force. He also testified that his training taught him to use deadly force if necessary in this situation. Sgt. Marquez testified similarly.

{37} Tom Gillespie testified on behalf of Defendant and was qualified as an expert witness in the area of police training, procedures, and the use of deadly force. Mr. Gillespie testified that Defendant's actions in firing his weapon to stop the alleged attack was consistent with his training and the policies and procedures of the LVPD. He also opined that the ramming of the police cruiser by Montoya constituted an aggravated battery on the police officers, a felony under New Mexico law. NMSA 1978, § 30–22–25 (1971)

{38} We hold that Defendant submitted sufficient evidence to warrant a jury instruction on justifiable homicide by a police officer. A reasonable jury, if it believed Defendant's version of the facts, could have concluded that Defendant was justified in using deadly force to protect himself and his partner. It is important to note that this entire incident began and ended very rapidly and the testimony contains many factual disputes that turn on the credibility accorded the witnesses. In our view, the reasonableness of Defendant's actions in using deadly force was for the jury to decide under instructions reflecting the provision of Section 30–2–6(B). *Archuleta*, 1999 NMCA 113, ¶ 14, 128 N.M. 13, 988 P.2d 883.

{39} The State reminds us that the jury was given UJI 14–5171, the general self-defense instruction and argues that it adequately addressed Defendant's concerns, so that refusing the justifiable homicide instruction was harmless error. We believe that Section 30–2–6(B) is intended to provide police officers a wider scope of privilege than the general public with regard to the use of deadly force. *Garner* and Section 30–2–6(B) do not work to make police officer justifiable homicide equal to or indistinguishable from normal self-defense. As detailed in Section 30–2–6(A), a police officer may be legally justified in using deadly force in a variety of situations that would not apply to self-defense and the ordinary citizen. Police officer justifiable homicide is sufficiently different from self-defense or defense of others that giving UJI 14–5171 does not render harmless the refusal to give Defendant's instruction.

{40} To support an instruction on ordinary self-defense, there must be evidence that defendant was put in fear by an apparent danger of immediate death or great bodily harm, that the killing resulted from that fear, and that defendant acted as a reasonable person would act under those circumstances. UJI 14–5171. The requirement for the immediacy of the threat that is necessary for self-defense or defense of others does not appear in Section 30–2–6. Further, Section 30–2–6(B) states that the public officer may use deadly force if he has "probable cause to believe he or another is threatened with seri-

ous harm" and differs from the requirement under UJI 14–5171 that an individual face "apparent danger of immediate death or great bodily harm." It is unclear how temporally proximate and severe the suspect's threatening actions must be to justify the use of deadly force by a police officer. And, as previously stated, this factual and situational inquiry explores the definition of "reasonableness" under the Fourth Amendment and is generally, but not always, a matter for the jury. *Johnson*, 1998–NMCA–019, ¶ 16, 124 N.M. 647, 954 P.2d 79.

{41} For example, one could foresee situations in which a police officer, even though not himself in immediate danger, might be justified in using deadly force to prevent a dangerous felon from evading capture and threatening serious harm to others outside the immediate scope of activity. A police officer shoulders that responsibility as part of his duty to protect the public. A private citizen's privilege, on the other hand, would be more narrowly contained to the immediate threat posed to the citizen and others in the immediate vicinity. This is one way in which the ordinary self-defense instruction simply does not convey the breadth of the use-of-deadly-force privilege that accompanies a police officer.

{42} Another example lies in Instruction 17 given by the Court at the request of the State. It states,

Self-defense is not available to the defendant if he was the aggressor unless;

(1) The defendant was using force which would not ordinarily create a substantial risk of death or great bodily harm; and

(2) Abelino Montoya responded with force which would ordinarily create a substantial risk of death or great bodily harm.

Private citizens ordinarily may not be the aggressor and then claim self-defense. Police officers, however, sometimes may have a lawful duty to be aggressors in the course of fulfilling their responsibilities to the public. It very much depends on the facts and circumstances of a given case. Instruction 17, while appropriate to ordinary self-defense, creates a fatal inconsistency as applied to the privilege of police officers. That is one more reason why the instruction on self-defense

falls short of defining the privilege available under law to police officers.

{43} Given these differences, we find it curious that the trial court could conclude that there was sufficient evidence to support a jury instruction on self-defense and defense of another, with its heightened requirements that the danger being threatened be grievous and immediate, but not enough to support an instruction on justifiable homicide. To the contrary, there may be situations of justifiable homicide applicable to a police officer that would not fit comfortably within the confines of ordinary self-defense and defense of another as applied to the public at large.

{44} We recognize that in this particular case the *only* harm allegedly threatened to Defendant and his partner was "immediate." That is, Defendant was not claiming a privilege to use deadly force to defend against any later, non-immediate threat. Thus, it might be argued that in this particular case the justifiable homicide instruction, as applied, was no broader than the ordinary self-defense instruction.

{45} We are not persuaded, however, that the error in rejecting Defendant's instruction can be so easily explained away. Either expressly or tacitly, rejection of the justifiable homicide instruction stripped Defendant of a defense uniquely applicable to police officers and others similarly situated. That rejection placed Defendant in the smaller shoes of an ordinary citizen. Yet the circumstances in which Defendant found himself and which provoked his shooting of Montoya, were anything but the circumstances of an ordinary citizen.

{46} Whether reversal is required is a close question. The error was preserved and the Court as a whole agrees that there is evidence supporting the justifiable homicide instruction. Thus, Defendant was entitled to the instruction. *State v. Rubio*, 1999–NMCA–018, ¶ 18, 126 N.M. 579, 973 P.2d 256. There is also an arguable view of the evidence which supports the argument that in this particular case the correct instruction would not add anything material to the defense. However, we cannot say as a matter of law that the evidence could not support a

jury finding of justifiable homicide. *See State v. Orosco,* 113 N.M. 780, 783–84, 833 P.2d 1146, 1149–51 (1992) (failing to instruct on an element of a case is not reversible error if there was no dispute that the element was established by the evidence). Thus, we cannot say the error was harmless beyond a reasonable doubt. *Cf. State v. Pettigrew,* 116 N.M. 135, 142, 860 P.2d 777, 784 (Ct.App.1993) (even constitutional error does not require reversal if it was harmless beyond a reasonable doubt). In such close circumstances, where the error involves the central issue in the case, it is the better policy to require a new trial under the correct instruction. Requiring a new trial obviates any need or opportunity for us to speculate as to how the jury might have resolved—or will resolve—the case under the correct instruction. Reversal also honors prior authorities requiring reversal for error in jury instructions where there is the slightest evidence of prejudice. *Kennedy v. Dexter Consol. Sch.,* 2000–NMSC–025, ¶ 27, 129 N.M. 436, 10 P.3d 115; *Bachicha v. Lewis,* 105 N.M. 726, 729, 737 P.2d 85, 88 (Ct.App.1987).

{47} In reaching our conclusion, we do not retreat from our holding in *Johnson.* In *Johnson,* the defendant submitted no evidence that he acted in self-defense or that he or anyone else was in any way physically threatened by the victim in that case. The circumstances in *Johnson* would not have supported an instruction on justifiable homicide if the shooting had been done by a police officer. *Id.* ¶ 2. Defendant has presented evidence that at a certain point the suspect presented a real threat to him and others. Whether that threat had dissipated sufficiently by the time he fired the fatal rounds to make his use of deadly force unreasonable was for the jury to decide.

{48} Finally, we note that UJI 14–5173 has not been modified to meet the requirements of Section 30–2–6(B) as amended in 1989, and does not reflect the current law of New Mexico on justifiable homicide by a public officer or public employee. *State v. Wilson,* 116 N.M. 793, 796, 867 P.2d 1175, 1178 (1994) (holding that this Court "has authority to question uniform jury instructions" that have been adopted by the Supreme Court, and

may "amend, modify, or abolish [an erroneous] instruction" if the instruction has not been previously challenged). As a service to the bar and a suggestion to the parties, UJI 14–5173 could be modified as follows:

### 14–5173. Justifiable homicide; public officer or employee.

Evidence has been presented that the killing of \_\_\_\_\_ (name of victim) was justifiable homicide. A homicide is justifiable when it is necessarily committed by a public officer or public employee while

[overcoming the actual resistance of \_\_\_\_\_ (name of victim) to the execution of \_\_\_\_\_ (describe legal process) ]

[overcoming the actual resistance of \_\_\_\_\_ (name of victim) to the discharge of \_\_\_\_\_ (describe other legal duty) ]

[retaking \_\_\_\_\_ (name of victim) (name of person), who committed \_\_\_\_\_ (name felony) and who had (been rescued) (escaped) ]

[arresting \_\_\_\_\_ (name of victim) (name of person) who committed \_\_\_\_\_ (name felony) and was fleeing from justice]

[attempting to prevent the escape from \_\_\_\_\_ (name place of lawful custody or confinement) by \_\_\_\_\_ (name of victim) (name of person) who committed \_\_\_\_\_ (name felony) ].

Homicide is necessarily committed when a public officer or public employee has probable cause to believe he or another is threatened with serious harm or deadly force while performing those lawful duties described above. For there to be probable cause, the facts must be such as would warrant a belief by a reasonable officer based upon the expertise and experience of the officer. [When feasible, a public officer or employee should give warning prior to using deadly force.]

The burden is on the state to prove beyond a reasonable doubt that the killing was not justifiable. If you have reasonable doubt as to whether the killing was justifiable, you must find the defendant not guilty.

## III. CHANGE OF VENUE

{49} Defendant moved for a change of venue pursuant to NMSA 1978, § 38–3–3(A)(2)(c) (1965), arguing that there had been extensive and prejudicial media coverage of the shooting which created an inordinate amount of public excitement and prejudice towards Defendant. After conducting an evidentiary hearing on the motion, the trial court denied the motion, but approved a supplemental jury questionnaire to gauge the jury panel's susceptibility to the media, prejudgment of the case, and bias. The trial court also reserved the right to grant the motion after voir dire. Defendant renewed his motion after voir dire and that motion was also denied. Defendant argues that the trial court abused its discretion in denying the motion and thereby violated his right to a fair trial.

{50} At the hearing, seven witnesses testified in support of the motion. All of the witnesses were community leaders or persons with direct involvement in the local media. Most of them felt it unlikely that the officers could receive a fair trial in San Miguel County. Multiple exhibits, including articles from the Las Vegas Daily Optic, the Albuquerque Journal and Journal North, the Santa Fe New Mexican and the Santa Fe Reporter, were admitted. Videotapes from three television stations, KOB, KOAT and KRQE, affiliated with the major networks were also presented as evidence.

{51} After reviewing the evidence, the trial court found that all but a few of the articles were neutral, unbiased, unemotional, and not inflammatory. The trial court also observed that most of the articles and on-air news reports had appeared in February and March of 1998 right after the shooting, and nineteen months before trial.

{52} There were one-hundred-thirty-four individuals on the available jury panel. One-hundred-thirteen individuals returned the supplemental questionnaires. Thirty-nine were determined to have prejudged the case and were excused from service based on their responses to the questionnaires. Twenty-one failed to return the questionnaire and were also excused from service. Sixty-nine persons appeared for voir dire. Five of those people professed a bias and were excused for cause.

{53} After voir dire, a jury of twelve persons and two alternates were selected to serve. None of the jurors selected for the petit jury indicated that they had any prejudice against Defendant, and would be anything but fair and impartial.

{54} The New Mexico constitution guarantees a criminal defendant a trial before an impartial jury. N.M. Const. Art. II, § 14; *see also State v. House*, 1999–NMSC–014, ¶ 26, 127 N.M. 151, 978 P.2d 967. To this end, Section 38–3–3 grants an accused the right to seek a change of venue. "In a case in which there [has] been no preceding changes of venue, this right to a venue change is generally mandatory and must be granted...." *House*, 1999–NMSC–014, ¶ 29, 127 N.M. 151, 978 P.2d 967. However, if the trial court determines that evidence in support of the motion is required, it may hold an evidentiary hearing. Upon the need for a evidentiary hearing, the "first change of venue ceases to be mandatory and is left to the court's discretion." *Id.* (citing *State v. Turner*, 90 N.M. 79, 81, 559 P.2d 1206, 1208 (Ct.App.1976)). The trial court's discretion in granting or denying a change of venue is "broad and will not be disturbed on appeal unless a clear abuse of that discretion can be demonstrated." *House*, 1999–NMSC–014, ¶ 31, 127 N.M. 151, 978 P.2d 967. "The burden of establishing an abuse of discretion is borne by the party that opposes the trial court's venue decision." *Id.* In determining if the trial court abused its discretion, we examine whether its decision is supported by substantial evidence in the record. *Id.* ¶ 32.

{55} In this case, the trial court heard evidence on the presumed prejudice of the residents of San Miguel County as a result of the surrounding publicity. Presumed prejudice makes inferences about the effect of publicity on the community as a whole, while actual prejudice is based upon direct evidence of bias in the minds of the individual prospective jurors. In *House*, our Supreme Court discussed the nature of the inquiry into presumed prejudice. *Id.* ¶ 46. A "change of venue should be granted if

evidence shows that the community is so saturated with inflammatory publicity about the crime that it must be presumed that the trial proceedings are tainted." *Id.*

{56} Upon hearing and viewing the evidence presented by Defendant at the hearing on his motion to change venue, the trial court was not persuaded that the news coverage of this case had been so biased and recent that an impartial jury could not be seated within San Miguel County and chose to conduct voir dire of prospective jurors. As with all aspects of a venue change, the choice of waiting until voir dire before granting or denying a motion to change venue rests with the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Id.* ¶ 55. Defendant has not carried his burden to establish that the trial court's decision to wait until voir dire before granting or denying his motion for change of venue was an abuse of discretion.

{57} The trial court's decision to conduct a voir dire of prospective jurors was a decision to conduct a direct examination of the actual prejudices of prospective jurors to establish whether there was such "widespread and fixed prejudice within the jury pool that a fair trial in that venue would be impossible." *Id.* ¶ 46. Defendant cites no such evidence and instead argues that the "mere possibility of undisclosed, actual juror prejudice is a strong argument in favor of changing venue." Defendant cites *State v. Shawan,* 77 N.M. 354, 358, 423 P.2d 39, 42 (1967), and asserts that "[t]o expect a juror to confess prejudice is not always a reliable practice." "We [are] mindful that it is the role of the trial court, and not the appellate court, to weigh the evidence and determine the credibility of witnesses." *House,* 1999–NMSC–014, ¶ 33, 127 N.M. 151, 978 P.2d 967. By failing to cite any evidence that the petit jury's opinions about the case were so fixed that jurors would be unlikely to lay aside their preconceived notions and base their judgments exclusively on the evidence presented at trial, Defendant has not carried his burden that the trial court's decision to deny a change of venue was an abuse of discretion. Any future change of venue shall remain at the discretion of the trial court.

## IV. EXCUSAL OF THE TRIAL JUDGE

{58} Defendant filed a peremptory notice of excusal, pursuant to Rule 5–106 NMRA 2001, to excuse the trial judge from hearing this case. The trial court refused to honor the notice of excusal, stating that it was untimely because Defendant previously requested the court to exercise its discretion in the case. Defendant argues that his notice was timely because it was filed within ten days of the date of his arraignment as required by Rule 5–106(C).

{59} The issue whether a party's peremptory disqualification of a trial judge is timely under Rule 5–106 presents a mixed question of historical facts and the application of the law to those facts. The court's findings as to historical facts are reviewed to determine whether they are supported by substantial evidence, and the application of law to those facts is reviewed de novo. *See State v. Attaway,* 117 N.M. 141, 144, 870 P.2d 103, 106 (1994).

{60} On October 14, 1998, agent Frank Jacoby of the New Mexico State Police filed a Criminal Complaint charging Defendant with numerous crimes arising from the shooting of Montoya, and the shooting at Rubio. Judge Eugenio S. Mathis was assigned to the case and set the preliminary hearing for December 14, 1998. On December 14, 1998, Defendant filed a motion to dismiss Counts VI and VII of the complaint. On January 28, 1999, Judge Mathis entered an order binding Defendant over on six of the charged offenses, and he dismissed Count II, Conspiracy to Commit Second Degree Murder. On that same day the Special Prosecutor filed the Criminal Information. Defendant's arraignment was set for February 18, 1999. On February 16, 1999, Defendant filed his Notice of Excusal under Rule 5–106.

{61} Under these facts, Defendant's argument that his notice of excusal was timely under Rule 5–106, because he filed it within ten days of the date of his arraignment of February 18, 1999, is without merit. It is well-settled in New Mexico that a party may not excuse a judge after the party has

requested that judge to perform a discretionary act. *See JMB Retail Props. Co. v. Eastburn,* 114 N.M. 115, 118, 835 P.2d 831, 834 (1992). Subsection A of Rule 5–106 does not set any time limit on this rule. Specifically, subsection A does not state it applies only if the party has requested the judge to perform a discretionary act during the period within which a notice of excusal must be filed under subsection C of Rule 5–106 to be considered timely.

{62} In our view, the time limits set forth in subsection C are subject to and conditioned on the rule of subsection A. In other words a notice of excusal is timely if filed within the period set forth in subsection C unless the party has asked the court to perform a discretionary act at some time before the notice is filed.

{63} In this case the preliminary hearing was conducted before the judge who had been assigned to hear the case, Judge Mathis. Defendant, on December 14, 1998, asked the judge, before whom that same matter was to be tried, to dismiss two counts of the criminal complaint. Thus, Defendant asked the trial court to exercise its discretion on a material matter in this case and the notice of excusal was untimely despite being filed within ten days of his arraignment.

## V. JURY INSTRUCTIONS FOR SHOOTING AT A MOTOR VEHICLE

{64} Defendant argues that the trial court erred when it refused to give the jury instruction he tendered addressing shooting at a motor vehicle contrary to NMSA 1978, § 30–3–8 (1993). Specifically, Defendant argues that the court erred because the instruction given omitted the element found in subsection C of Section 30–3–8 that provides that the section does not apply to a law enforcement officer discharging a firearm in the lawful discharge of his duties.

{65} In this case, the trial court gave the instruction that was tendered by Defendant. The instruction tendered by Defendant did not include a modified version of subsection four of UJI 14–343 NMRA 2001 that reads "The Defendant was not a law enforcement officer engaged in the lawful performance of duty." Instead the instruction tendered by Defendant and given by the court modified UJI 14–343 to include as an element that the State was required to prove that "the Defendant was not acting in self-defense or defense of others."

{66} When a defendant does not object to a jury instruction as given, we review only for fundamental error. *State v. Cunningham,* 2000–NMSC–009, ¶ 8, 128 N.M. 711, 998 P.2d 176. Because we are remanding for a new trial, we need not inquire if the tendered jury instruction rises to the level of fundamental error. However, in the event of a new trial on this count, the jury should be instructed on the element found in subsection C of Section 30–3–8.

## VI. SUFFICIENCY OF THE EVIDENCE TO SUPPORT CONVICTION FOR VOLUNTARY MANSLAUGHTER AND AGGRAVATED BATTERY

{67} Defendant contends that no reasonable jury could have reasonably determined that the shooting was not in self-defense or the defense of Sgt. Marquez and as a result his conviction is not based on sufficient evidence. In reviewing a challenge to the sufficiency of the evidence to support a criminal conviction, we review the record to determine whether substantial evidence, either direct or circumstantial, exists such that a rational jury could have found proof beyond a reasonable doubt with respect to every element of the charged offense. *State v. Ungarten,* 115 N.M. 607, 609, 856 P.2d 569, 571 (Ct.App.1993). In applying this standard we view the evidence in a light most favorable to the State and resolve all conflicts and indulge all permissible inferences in favor of upholding the verdict of the jury. *Id.* We have reviewed the record and find there was substantial evidence to sustain Defendant's convictions—even under proper instructions—for voluntary manslaughter, and aggravated assault with a deadly weapon, and shooting at a motor vehicle resulting in injury. *See State v. Foxen,* 2001–NMCA–061, ¶ 18, 130 N.M. 670, 29 P.3d 1071.

## VII. CONCLUSION

{68} The judgment and sentence of the district court is reversed and the matter is remanded with instructions that Defendant be granted a new trial.

{69} IT IS SO ORDERED.

WE CONCUR: RICHARD C. BOSSON, Chief Judge.

JAMES J. WECHSLER, Judge, (concurring in part and dissenting in part).

WECHSLER, Judge (concurring in part and dissenting in part).

{70} I agree that there is a view of the evidence such that Defendant could construct a defense of justifiable homicide. However, I do not believe that a jury instruction on justifiable homicide would have made a material difference in this case. With that belief, I respectfully dissent from the majority's holding reversing and remanding for a new trial on the voluntary manslaughter and aggravated assault with a deadly weapon charges.

{71} The defense of justifiable homicide permits a law enforcement officer to use deadly force to arrest a fleeing felon when the officer has probable cause to believe that the officer or another is threatened with serious harm or deadly force. Section 30–2–6. Defendant was trying to stop Abelino Montoya, there was testimony that Mr. Montoya had committed a felony, and Defendant testified that he used deadly force because he believed that Mr. Montoya was attacking Sergeant Marquez and himself. The issue of whether Mr. Montoya was fleeing at the time was an issue of fact for the jury. On this basis, Defendant was entitled to the justifiable homicide instruction. *State v. Nieto*, 2000–NMSC–031, ¶ 15, 129 N.M. 688, 12 P.3d 442 (stating that a defendant is entitled to have the jury instructed on his theory of the case if supported by the evidence).

{72} However, the failure to give the instruction is not reversible error in the absence of prejudice. *State v. Ho'o*, 99 N.M. 140, 145, 654 P.2d 1040, 1045 (Ct.App.1982); *State v. Ramos*, 116 N.M. 123, 130, 860 P.2d 765, 772 (Ct.App.1993) (stating that a defendant must show prejudice as a result of rejecting proffered instruction to establish error).

{73} Defendant fairly raised the question of whether he acted to protect Sergeant Marquez or himself. He testified at trial that he placed his car in a position to block Mr. Montoya's truck so that he could execute a "felony-stop." He was very clear in his testimony that the truck reversed twice toward his car. He testified that he believed that the truck was coming back to hit him once again when he fired his second and third shots to the back of the truck. He was specific in his testimony that he believed at the time that Mr. Montoya was attacking both Sergeant Marquez and him with the truck such that his use of deadly force was justified. Sergeant Marquez testified that he fell out of the car as the truck pushed the car backward. He said that he saw the truck's tires coming at him and he fired because he feared his life was in danger.

{74} Defendant's testimony supported instructions on self-defense and defense of another, which the jury received. With these instructions, the jury was instructed that if Defendant believed that he or Sergeant Marquez was in immediate danger of death or great bodily harm, and that Defendant shot Mr. Montoya to prevent the death or great bodily harm and acted as a reasonable person in the same circumstances would have, the jury should find Defendant not guilty. UJI 14–5171, UJI 14–5172 NMRA 2001. Defendant does not contend that there is any significant difference in this case between these requirements and the requirements of justifiable homicide that an officer have probable cause to believe the officer or another is threatened with serious harm or deadly force. Faced squarely with this determination, the jury concluded that Defendant did not act in self-defense or defense of another.

{75} I agree with the majority that the defense of justifiable homicide is broader in the general sense than self-defense or defense of another. It is uniquely available to law enforcement officers who may have to be aggressors in their protection of the public and whom we do not want to handicap in the performance of their lawful duties.

{76} As the majority points out, a justifiable homicide defense embraces more than the immediate situation addressed by self-defense or defense of another. In justifiable homicide, an officer may indeed use deadly force to prevent the escape of a fleeing felon who is a threat of serious harm or deadly force to other persons who are not at the flight scene. But, most significantly, there were no material issues of such threats of harm in this case. Defendant testified that he acted to prevent the immediate harm to himself or Sergeant Marquez. Tom Gillespie, who testified on Defendant's behalf as an expert on police training, procedure, and the use of force, presented testimony that Defendant acted in accordance with his training when Defendant thought the truck was going to come back to him. But, Mr. Gillespie did not testify that the circumstances justified the use of deadly force to avoid harm to unidentified persons or any person other than Defendant or Sergeant Marquez. Thus, although I agree that the defense of justifiable homicide could, under certain circumstances, permit the use of deadly force for the protection of the public even if an officer was not acting under an immediate threat of harm that could justify self-defense or defense of another, such issues were not material ones in this case.

{77} Moreover, the jury was entitled to consider Defendant's position as a law enforcement officer. In addition to the elements concerning the reasons for a defendant's actions, self-defense and defense of another require that a defendant act as would a reasonable person under the same circumstances. UJI 14–5171, 5172. A person under the same circumstances in this case is a law enforcement officer. Defendant presented evidence, including an expert witness, and argued that he acted as a reasonable law enforcement officer under the circumstances. As a result, I do not believe there was prejudice in this case because the self-defense and defense of others defenses required the jury to address all the elements essential to Defendant's defenses on the evidence adduced at trial, including justifiable homicide.

{78} Defendant contends that he was prejudiced by his inability to counter the State's statements to the jury about the illegality of shooting a fleeing suspect. However, although Defendant moved for a new trial based on these statements, he did not, as he could have, object to them during argument. *See State v. Carmona,* 84 N.M. 119, 121, 500 P.2d 204, 206 (Ct.App.1972) ("Objections made after the close of the district attorney's argument came too late in the day."). In addition, Defendant testified that he did not act in any such manner.

{79} Nor does Jury Instruction No. 17 concerning the limitation of self-defense based on who was the aggressor, which was given by the court, indicate prejudice to Defendant. Under Defendant's theory of the case, he was not the aggressor. Jury Instruction No. 17 did not limit self-defense, even if Defendant was the aggressor, if (1) Defendant "was using force which would not ordinarily create a substantial risk of death or great bodily harm; and" (2) "Abelino Montoya responded with force which would ordinarily create a substantial risk of death or great bodily harm." The first element was not an issue in this case. The State did not argue that Defendant used force as an aggressor that would ordinarily create a risk of death or great bodily harm. The second element of the instruction was not a factor because, under Defendant's theory, it was necessary that the jury find that Mr. Montoya acted essentially with the same force required under the second element to support a justifiable homicide defense. Therefore, while it is true, as the majority states, that a justifiable homicide defense is broader than self-defense because it enables an officer to argue, as a private citizen may not, that the officer was initially the aggressor, but then acted in self-defense, there is no inconsistency when the defense of justifiable homicide is applied to the facts as argued in this case.

{80} Defendant is entitled to a fair trial, not a perfect one. *State v. Allen,* 2000–NMSC–002, ¶ 95, 128 N.M. 482, 994 P.2d 728. Defendant raised a defense based upon protecting Sergeant Marquez and himself. He was entitled to raise this defense by self-defense and defense of another as

well as justifiable homicide. Generally, the justifiable homicide instruction states the defense for a law enforcement officer in a broader manner such that arguments are available to an officer that are not permissible for an ordinary citizen. However, in the circumstances of this case, in which the essential issues involved Defendant's actions in response to the immediacy of a threat to himself and Sergeant Marquez, the broader arguments available under the justifiable homicide defense were immaterial. I do not believe that Defendant was prejudiced by the failure of the court to provide a justifiable homicide instruction.

{81} I concur in all other aspects of the majority's opinion and would, therefore, affirm Defendant's conviction of voluntary manslaughter and aggravated assault with a deadly weapon and address Defendant's argument concerning his conviction of shooting at a motor vehicle resulting in injury.