2003-NMCA-144

81 P.3d 591

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**James LANEY, Defendant–Appellant.**

No. 22,748.

Court of Appeals of New Mexico.

Oct. 14, 2003.

Certiorari Denied, No. 28,360, Dec. 1, 2003.

Patricia A. Madrid, Attorney General, James O. Bell, Assistant Attorney General, Santa Fe, NM, for Appellee.

John B. Bigelow, Chief Public Defender, Trace L. Rabern, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

BUSTAMANTE, Judge.

{1} Defendant James Laney appeals his conviction for homicide by vehicle (reckless),

great bodily injury by vehicle, leaving the scene of an accident (great bodily harm or death), and reckless driving. Defendant raises six issues for our review: (1) speedy trial violation, (2) improper testimony elicited by the State from its expert witness, (3) denial of his proposed jury instruction on "operating" a motor vehicle, (4) fundamental error in failing to declare a mistrial, (5) merger of his convictions for vehicular homicide and the lesser-included offense of reckless driving, and (6) cumulative error. As to the fifth issue, the State agrees that it was error to convict and sentence Defendant on the lesser-included offense of reckless driving, and therefore, we do not consider this issue on appeal. As to the remaining issues, we find no error and, hence, no cumulative error. We affirm and remand, directing the district court to enter an amended judgment and sentence vacating the reckless driving conviction. *See State v. Pierce*, 110 N.M. 76, 87, 792 P.2d 408, 419 (1990) (holding that State may charge separately for the same offense, but the convictions for more than one of the offenses cannot stand). All other issues raised in Defendant's docketing statement are deemed abandoned. *State v. Fish*, 102 N.M. 775, 777, 701 P.2d 374, 376 (Ct.App. 1985) (noting issues listed in the docketing statement but not argued in the brief in chief are deemed abandoned).

## FACTUAL BACKGROUND AND PROCEEDINGS

{2} On April 14, 2000, Defendant was involved in a fatal car accident. Defendant fled the scene on foot, but was apprehended and arrested eleven days later. An indictment was issued on May 9, 2000, charging Defendant with homicide by vehicle (reckless), great bodily injury by vehicle (reckless), leaving the scene of an accident (great bodily harm or death), receiving or transferring a stolen vehicle (possession), and reckless driving. After three continuances, two rule extensions, and several motions, the case was eventually tried before a jury on March 28, 2001, some eleven months after Defendant's arrest.

{3} Most of the facts elicited at trial are undisputed. Defendant was in a small Mazda sports car traveling eastbound on Academy Road in Albuquerque, New Mexico. The Mazda turned northbound onto Marcheta in front of an oncoming half-ton, Chevy pickup. The pickup, which was traveling westbound on Academy, "T-boned" the Mazda, instantly killing the right front passenger, Sean Roseberry. The passenger in the pickup was seriously injured. The driver of the pickup and Defendant sustained only minor injuries. Defendant stipulated that the Mazda's sudden turn in front of the pickup was one of the primary causes of the accident. The only disputed issue was the identity of the Mazda's driver.

{4} The defense maintained there were three men in the Mazda, while the State argued there were two, Defendant and Roseberry. Eyewitnesses, including the driver of the pickup, and two persons who stopped to render aid, observed one person fleeing the scene, although their descriptions varied somewhat. Only one witness, however, could identify Defendant as the man he saw leaving the scene. The defense argued that the pickup driver saw the driver of the Mazda crawl out of the car, whereas the man who was seen leaving the scene by the other witnesses was Defendant, who had been in the right rear seat.

{5} Both sides provided expert testimony to support their theory. A forensic pathologist and OMI supervisor, Dr. Gerri McLemore, testified for the State about Roseberry's extensive injuries. The State's expert in accident reconstruction and occupant kinetics, Parker Bell, opined that given the dynamics of the accident, a person seated in the right rear seat would most likely have sustained injuries similar to those sustained by Roseberry. Defendant's expert, Dr. Karen Greist, in contrast, testified that Defendant's injuries, consisting of a long rectangular bruise and abrasion running diagonally from his upper right shoulder to his lower left rib cage, were consistent with a seat belt injury. Two defense witnesses testified Defendant was coughing up blood and had bruising to his right arm and chest area after the accident.

{6} Jury deliberation began on a Friday, the third day of trial. After four hours of deliberation, the jury advised the district

court it was "deadlocked" on two counts. Although ten jurors polled stated they were hopelessly deadlocked and did not believe further deliberations would be helpful, both counsel rejected the district court's offer to receive the verdicts on three counts and declare a mistrial on the other two. Instead, the parties agreed to send the jury home for the weekend. The jury eventually acquitted Defendant on the stolen vehicle charge, but convicted him on the remaining four counts.

## I. Speedy Trial

{7} The initial prosecution of Defendant was quick—he was indicted on May 10, 2000, only fifteen days after his arrest on April 25. Discovery problems, on the other hand, abounded over the next seven months. Counsel for the defense filed his Entry of Appearance and Demand for Speedy Trial on May 17, 2000. A Motion to Dismiss for failure to provide discovery was filed on July 10, 2000. This apparently prompted the State to enter its appearance the next day, two months after the indictment issued. Defense counsel then filed two additional motions, including a Motion to Quash for failure to present exculpatory evidence of Defendant's "seat belt" injuries to the grand jury and a motion to disclose confidential informant on August 18, 2000. Motions were heard on September 5, 2000. In support of the Motion to Quash, defense counsel displayed photographs of Defendant's injuries, which he maintained were consistent with a right-hand seat belt injury. At that time, defense counsel advised the district court that he hired a private investigator to take the photographs on May 21, and that in July, it had procured Dr. Greist, an expert in forensic pathology, to testify that the injuries supported Defendant's defense. The district court denied the motions to quash and dismiss, but ordered the State to disclose the informant and immediately disclose any existing discovery, including initial police reports, photographs, and the search warrant. Supplemental reports and crime lab reports were ordered to be disclosed within one week.

{8} A second Motion to Dismiss was filed on September 22, 2000, in which Defendant complained that he had not yet received the "Final Supp Out,"[1] although the "case [had] been pending for several months." A second hearing was held on September 27 during which the State represented that the "Supp Out" was provided on September 20, however, because defense counsel did not have a copy, the completed report was provided after the hearing.

{9} As a result of these discovery delays, a Stipulated Motion to Continue vacating an October 4, 2000, trial setting was granted at Defendant's request. A second stipulated continuance vacating a November 6, 2000, trial setting was granted at the State's request. As grounds for that continuance, the State explained that pretrial interviews were set for November 1, but one witness was out of town. Over Defendant's objection, the State then requested a three-month extension, pursuant to Rule 5–604 NMRA 2003, to interview this witness. An extension was granted through February 19, 2001, and the trial was reset for February 5, 2001. In the meantime, the State filed a stipulated Motion for DNA Standard on December 1, 2000, to obtain a sample from Defendant for testing. A second Rule 5–604 Petition was granted by the Supreme Court, over Defendant's objection, because the DNA results were not ready, and because the defense expert, Dr. Greist, had not been made available to the State for an interview. Eleven months and two days after Defendant's arrest, the trial began. On the day of the trial, Defendant made several pretrial motions, including a motion to dismiss on speedy trial grounds, which was denied.

{10} The right to a speedy trial is protected by the Sixth Amendment, made applicable to the states through the Fourteenth Amendment, and Article II, Section 14 of our state constitution. *State v. Manzanares*, 1996–NMSC–028, ¶ 8, 121 N.M. 798, 918 P.2d 714. The right attaches when the defendant becomes an accused, either at the

---

1. The parties use the term "Final Supp Out" which refers to the final supplemental report prepared by the investigating officer that includes police reports, crime lab analysis, and other documents relating to the investigation.

time of arrest or upon the issuance of an indictment or information. *See id.* When a speedy trial claim is made, the defendant must make a threshold showing that the length of delay is presumptively prejudicial. *See State v. Coffin,* 1999–NMSC–038, ¶ 55, 128 N.M. 192, 991 P.2d 477. Once that showing has been made, the burden of persuasion shifts to the State to show, on balance, that the four factors do not weigh in favor of dismissal. *Id.* ¶ 58; *Manzanares,* 1996–NMSC–028, ¶ 8, 121 N.M. 798, 918 P.2d 714; *Zurla v. State,* 109 N.M. 640, 646, 789 P.2d 588, 594 (1990). Courts balance four factors to determine whether a speedy trial violation has occurred. *Id.* The factors to be considered are: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant." *Plouse,* 2003–NMCA–048, ¶ 34, 133 N.M. 495, 64 P.3d 522; *accord Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Zurla,* 109 N.M. at 642, 789 P.2d at 590. On appeal from a speedy trial claim, "we [defer] to the district court's fact finding, [but] independently examine the [four factors] to ensure that no violation has occurred." *State v. Plouse,* 2003–NMCA–048, ¶ 34, 133 N.M. 495, 64 P.3d 522; *see Coffin,* 1999–NMSC–038, ¶¶ 56, 58, 128 N.M. 192, 128 N.M. 192; *Manzanares,* 1996–NMSC–028, ¶ 1, 121 N.M. 798, 918 P.2d 714.

### Length of the Delay

{11} The length of the delay is a two-fold inquiry. Initially, we determine whether the delay is presumptively prejudicial. If it is presumptively prejudicial, we balance the length of the delay against the remaining three factors to assess whether the constitution has been violated. *See Coffin,* 1999–NMSC–038, ¶ 55, 128 N.M. 192, 991 P.2d 477. "[A] determination of whether delay is presumptively prejudicial requires consideration of (at least) the length of time between arrest or indictment and prosecution, the complexity of the charges, and the nature of the evidence against the accused." *Salandre v. State,* 111 N.M. 422, 426, 806 P.2d 562, 566 (1991). We have held that "a minimum of nine months delay is necessary to trigger further inquiry into the claim of a violation of the right to speedy trial in simple cases, twelve months in cases of intermediate complexity, and fifteen months in complex cases." *Coffin,* 1999–NMSC–038, ¶ 56, 128 N.M. 192, 991 P.2d 477. We defer to the district court's finding on the question of complexity when it is supported by substantial evidence since the "trial court [is] familiar with the factual circumstances, the contested issues and available evidence, the local judicial machinery, and reasonable expectations for the discharge of law enforcement and prosecutorial responsibilities." *Manzanares,* 1996–NMSC–028, ¶ 9, 121 N.M. 798, 918 P.2d 714.

{12} Defense counsel characterizes this case as a "simple traffic accident" in which all of the evidence was available on the day of the accident, most relevant facts were stipulated to, and the only disputed issue was whether Defendant was driving. On the other hand, given that the trial lasted over two days, included ten witnesses, three of whom were experts, and because the use of DNA evidence was contemplated, the State urges that it is a case of intermediate complexity.

{13} The district court did not make any finding on the issue of complexity but considered the four factors and denied the motion. The district court explained:

> I'm going to deny the motion. I think that delay can be attributed to both parties. Again, my—when looking at the length of the delay, reason for the delay, the prejudice, assertion of rights, my main reason for denying it is I don't feel the Defendant has been prejudiced.

{14} Because the district court engaged in an analysis of the four factors, we assume it found the delay was presumptively prejudicial, and thus a simple case. Even so, we do not agree that this was the "simple traffic accident" that Defendant urges. *See Coffin,* 1999–NMSC–038, ¶ 57, 128 N.M. 192, 991 P.2d 477 (reviewing court is free to make a determination on the issue of complexity, absent specific findings by the district court). Typically, "simple cases require less investigation and tend to involve primarily police officer testimony during the trial." *State v. LeFebre,* 2001–NMCA–009, ¶ 11, 130 N.M. 130, 19 P.3d 825. Cases of intermediate

complexity, on the other hand, seem to involve numerous or relatively difficult criminal charges and evidentiary issues, numerous witnesses, expert testimony, and scientific evidence. *See, e.g., State v. Tortolito*, 1997–NMCA–128, ¶ 3, 124 N.M. 368, 950 P.2d 811 (upholding trial judge's finding that case involving aggravated burglary, armed robbery, and criminal sexual penetration fall into the "high end of the intermediate[ ] complex range," in part, because investigation required collection and analysis of DNA samples) (internal quotation marks omitted); *see also State v. Ortiz–Burciaga*, 1999–NMCA–146, ¶ 31, 128 N.M. 382, 993 P.2d 96 (finding by trial court case involving multiple counts of criminal sexual contact of a minor and criminal sexual penetration of a minor requiring deposition testimony of the twelve-year-old victim and testimony of several experts was of intermediate complexity not contested on appeal). Depending on the circumstances, vehicular homicide cases may fall in the intermediate category. *See State v. White*, 118 N.M. 225, 226, 880 P.2d 322, 323 (Ct.App.1994) (noting that nature of charges in a case of homicide and great bodily injury by vehicle could be sufficient to establish intermediate complexity, but parties agreed it was a simple case).

{15} While the complexity issue is a close call here, we agree with the district court that the delay was presumptively prejudicial. Nonetheless, we find that it falls in the high end of the simple complexity range. Even though the defense stipulated to many facts, the ultimate question of who was driving was hotly contested. Ten witnesses were needed to testify on that single question, including an accident reconstruction expert and two experts in forensic pathology.

{16} We next consider the extent of the delay beyond the presumptively prejudicial period to determine whether the delay will weigh against the State, bearing in mind that the presumption of prejudice to the defendant intensifies over time. *See Coffin*, 1999–NMSC–038, ¶ 59, 128 N.M. 192, 991 P.2d 477 (holding that the delay is presumptively prejudicial does not necessarily mean the first factor weighs against the State but requires further consideration of the extent of the delay beyond this period). The length of delay is sixty-two days over the minimum presumptively prejudicial period. Given that this case falls in the high end of a simple case, bordering on intermediate, we find that this factor has little practical effect on the balancing. *See White*, 118 N.M. at 226, 880 P.2d at 323 (finding that a month and a half delay beyond presumptive period in a simple vehicular homicide case had no practical effect on the balancing).

### Reasons for the Delay

{17} "We examine the reasons for delay, allocating the reasons for the delay to each side and determining the weight attributable to each reason." *Plouse*, 2003–NMCA–048, ¶ 45, 133 N.M. 495, 64 P.3d 522 (internal quotation marks and citation omitted). Our inquiry is premised on the notion that the State has a "constitutional duty to make a diligent, good-faith effort to bring a defendant to trial." *Zurla*, 109 N.M. at 643, 789 P.2d at 591 (internal quotation marks and citation omitted). In assessing the conduct of the parties, we look at the State's culpability in causing the delay. *See id.* Negligent delay, such as delay attributable to excessive caseload, is deemed a more neutral reason that weighs lightly against the State, whereas intentional delay, such as tactical delays, weighs heavily against the State. *See id.* Intermediate categories of delay, such as bureaucratic indifference or failure to take reasonable means to bring a case to trial, are considered more culpable and weigh more heavily against the State, especially if the defendant has sought to safeguard his rights. *See id.*

{18} Defendant maintains that any delay in bringing the case to trial was entirely attributable to the State because of its delay in providing discovery. The State responds that Defendant is largely responsible for the sixty-two day delay. It argues that Defendant not only agreed to the first two continuances, but in fact filed the first one, and the third continuance was required partly because his expert was unprepared. The district court found both parties were responsible for the delay. We first observe that the State's assumption that we consider only the

delay beyond the presumptive period in our analysis of this factor is incorrect; we consider reasons for the entire eleven months and two day delay.

{19} The record reflects that the "Final Supp Out" was provided to defense counsel by September 27, 2000, as soon as it was available to the State, albeit some five months after the accident. Although the State provided the reports in the possession of the investigating officer at the September 5 hearing, it did so only in response to the district court's order to produce it. The record does not reflect that the State made any effort to obtain those reports prior to September 5 despite the fact that the motion to dismiss was filed two months earlier. The only discovery provided before September 5 was the complaint. We also find that the reason given for the delay in producing the "Final Supp Out" at the September 5 hearing was insufficient. While the State explained that the crime lab reports were pending based on the analysis of the clothing found at Defendant's apartment, there was no explanation for the lab's four-month delay. Officer Campbell also briefly explained the substation was somewhat disorganized because of the "Big I" construction, but he did not elaborate on why this would delay the report. Without providing a record to better explain the delay, the State has failed to meet its burden of persuasion. On balance, we find the State was negligent in failing to provide discovery before mid-September. Therefore, this delay, and the resulting continuance on October 4, 2000, weigh heavily against the State. *See Tortolito,* 1997–NMCA–128, ¶¶ 12–13, 124 N.M. 368, 950 P.2d 811 (holding unreasonable delays attributable to the State's negligence or willfully oppressive conduct in DNA testing weigh heavily against the State, whereas delays attributable to the lab's normal priorities and procedure weigh less heavily against the State).

{20} On the other hand, the failure to provide timely discovery did not cause delay resulting from the second continuance. We find the inability to complete all but one interview by November 1, 2000, because the witness was out of state, is a more neutral reason, that weighs only slightly against the State.

{21} Despite Defendant's objection to the third continuance, we agree that Defendant was jointly responsible for that delay because his own expert was unprepared and unavailable to the State for an interview. Defendant's assertion that his expert was unprepared because discovery was delayed is suspect. The record reflects that Defendant knew what his defense was going to be as early as July 2000, when he hired his expert, if not earlier, when he hired a private investigator to photograph Defendant's injuries on May 21, 2000. Dr. Greist testified that she based her opinion on the police reports, medical records, the May photographs of Defendant's injuries, and an examination of Defendant, which she did not perform until sometime in October. All reports, except the DNA analysis, were made available by September 25, and the pretrial interviews of the State's witnesses were done by November. We see no reason why the discovery delay would prevent a pretrial interview of Defendant's expert, Dr. Greist.

{22} Once again, the State offered no explanation why it waited until December to obtain a DNA standard, but it appears from the record that the blood was being tested at the time of the September 5 hearing. We agree with the district court that the parties were jointly responsible for this delay, and under the circumstances, we give no weight to the delay caused by this continuance. On balance, we conclude that this factor weighs moderately against the State.

### Assertion of the Right

{23} To assign weight to Defendant's assertion of his speedy trial right, we explore the timing and manner in which Defendant asserted his right. *Coffin,* 1999–NMSC–038, ¶ 67, 128 N.M. 192, 991 P.2d 477; *Plouse,* 2003–NMCA–048, ¶ 48, 133 N.M. 495, 64 P.3d 522. Defendant argues that he repeatedly asserted his right to a speedy trial, first by filing a demand for speedy trial on May 17, 2000, and implicitly through his motions to dismiss, objections to the third continuance, and the two Rule 5–604 petitions. Nonetheless, Defendant did not specifically

invoke a ruling on his speedy trial right until the day of trial. *See Tortolito*, 1997–NMCA–128, ¶¶ 15–17, 124 N.M. 368, 950 P.2d 811 (implying mere mention of speedy trial during motion to reconsider conditions of release, without invoking a ruling on the issue was insufficient to assert speedy trial right).

{24} The July and September motions to dismiss never raised a speedy trial issue, and we find no evidence in the record that Defendant asserted his right at the hearings on these motions. Further, despite his objection to the last continuance, Defendant was not ready for trial in February. *See Coffin*, 1999–NMSC–038, ¶ 67, 128 N.M. 192, 991 P.2d 477 (finding assertion of speedy trial right was not meaningful where the defendant objected to rule extension but represented he was not prepared for trial). While objections to the rule extensions may be persuasive evidence of an assertion, it is not conclusive. *Id.* The first rule extension was granted in November because the last State witness was out of town. Defendant was partially responsible for the second rule extension because his witness was unprepared, making his objection to that rule extension meaningless. *Id.* Because Defendant waited until the eleventh hour to specifically and meaningfully invoke a ruling on the speedy trial issue, we find this factor weighs only slightly in his favor.

**Prejudice**

{25} "The right to a speedy trial protects the following three interests of a criminal defendant: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Coffin*, 1999–NMSC–038, ¶ 68, 128 N.M. 192, 991 P.2d 477 (internal quotation marks and citation omitted). To support a finding of prejudice, "the evidence [must show] a nexus between the undue delay in the case and the prejudice claimed." *Salandre*, 111 N.M. at 431, 806 P.2d at 571; *see State v. Grissom*, 106 N.M. 555, 563, 746 P.2d 661, 669 (Ct.App.1987) (holding loss of documents and death of witness did not impair defense where both events occurred when there was no presumption of prejudice).

{26} Defendant claims to have been prejudiced as a result of the delay in four ways. First, he was incarcerated for the entire eleven-month period. Next, the Mazda that was involved in the accident was inadvertently destroyed, thus preventing his expert, as well as the State's accident reconstruction expert and the investigating officer, from obtaining all of the information they desired. Third, Defendant's shoulder strap injuries healed and his scars shrank by the time of trial. Finally, Defendant had to be transported to the county courthouse from jail for his wedding on July 25, 2000.

{27} The State persuasively argues that Defendant does not claim and the record does not support the proposition that the car was destroyed after January 25, 2001, the time when the delay became presumptively prejudicial. Defendant claims the car was destroyed several months before trial. Nor is there any evidence that Defendant's injuries and scars were substantially different before January 25. Even if the injuries had changed substantially after January 25, Defendant was only minimally prejudiced because the defense had access to at least one photograph of Defendant taken eleven days after the accident, had photos taken of the injuries only one month after the accident, waited until October to have his own forensic pathologist conduct an examination of the injuries, and there was some visible bruising apparently left for jurors to observe at trial.

{28} We also find that Defendant was primarily responsible for any impairment to his defense. Defendants must make an effort to discover or obtain evidence, which they are or should be aware of, in support of their defense. *Id.* at 564, 746 P.2d at 670 (holding that with regard to the defendant's claim that destruction of documents impaired his defense, defendant has a duty to initiate efforts to discover or obtain evidence of which defendant is aware); *see Sodergren v. State*, 715 P.2d 170, 178 (Wyo.1986) (concluding any impairment to defense because physical marks left at the accident scene vanished over two-year delay, hindering the defendant's accident reconstruction expert's ability to testify, was due to the defendant's failure to preserve evidence); *Tortolito*,

1997–NMCA–128, ¶ 20, 124 N.M. 368, 950 P.2d 811 (stating that the defendant must accept responsibility for impairment of his defense where he failed to identify potential alibi more than a year after the State filed a demand for notice of alibi). The need to inspect the Mazda existed from the beginning, yet the record does not reflect any evidence Defendant attempted to inspect the car prior to its destruction, even though he hired a private investigator within a month of the accident and he hired an expert in July. Neither does it appear he attempted to ensure the car was preserved. On the whole, we do not find any significant impairment to Defendant's defense as a result of the delay.

 {29} With regard to Defendant's other claims, we emphasize that the focus of our inquiry in a speedy trial analysis is on undue prejudice. *Coffin*, 1999–NMSC–038, ¶ 69, 128 N.M. 192, 991 P.2d 477. Some degree of oppression and anxiety is inherent for every defendant who is jailed while awaiting trial. *Plouse*, 2003–NMCA–048, ¶ 53, 133 N.M. 495, 64 P.3d 522; *Zurla*, 109 N.M. at 644, 789 P.2d at 592; *see also Coffin*, 1999–NMSC–038, ¶ 69, 128 N.M. 192, 991 P.2d 477. With respect to pretrial incarceration, the question is whether the length of time was unacceptably long in that it became unduly prejudicial so as to factor into the analysis. *See Salandre*, 111 N.M. at 431, 806 P.2d at 571. Without evidence that the defense was impaired, we do not find Defendant's pretrial incarceration to be unduly prejudicial. Nor do we find the fact Defendant was married in jail three months after his arrest to be unduly prejudicial. Accordingly, we determine that Defendant has failed to show any undue prejudice that resulted from the eleven-month delay in this case.

 {30} Based on the foregoing, we hold Defendant's speedy trial right was not violated. This case sits on the line between simple and intermediate complexity, perhaps giving the State some basis for the lengthy discovery delay, especially in light of Defendant's less than vigorous assertion of his right. Most critically, however, we find Defendant failed to show he was unduly prejudiced.

## II. Testimony of the State's Expert Witness

{31} Defendant next argues that it was error for the prosecutor to elicit testimony from the State's accident reconstruction expert, Parker Bell, regarding the specific injuries he would expect Defendant to sustain in the accident. Before Bell testified, Defendant made an oral motion in limine to limit Bell's testimony because he was not qualified as a medical expert. The district court opted to wait until trial to determine whether Bell was qualified to give such an opinion. During trial, defense counsel renewed his objection, and the district court ordered the State to lay a foundation on occupant kinetics to determine if Bell was qualified to testify regarding the injuries that might be expected given the force of the accident. The district court subsequently ruled, and defense counsel agreed, that Bell could testify about the seriousness of the injuries or the general types of injuries but not specific injuries, such as a broken arm or leg. Sometime later, defense counsel requested that the State lay an *Alberico* foundation. *See State v. Alberico*, 116 N.M. 156, 166, 861 P.2d 192, 202 (1993) (identifying prerequisites for admission of expert testimony). After the State attempted to lay that foundation, the following exchange took place:

Q. Would this individual in this kind of accident sitting in the back seat be able to get away from the scene?

A. No. I believe they would be basically trapped.

[DEF]. I'm going to object. Lack of foundation.

THE COURT. I'm going to sustain the objection to that question.

Q. The injuries that an individual would have in this back seat, what capacity would that individual have?

A. He would be incapacitated.

[DEF]. Again, I'm going to object and ask that it be stricken.

THE COURT. Sustained.

At the bench, the district court advised the State, "I think we're starting to get into the medical end of it which ... he's already testified there would be a great amount of

energy on that body." The prosecutor agreed and resumed his examination. No further objections or motions were made by defense counsel at trial concerning this particular testimony. In his reply brief, Defendant also complains of two other instances where, despite the district court's order, the prosecutor continued to ask questions that, in Defendant's view, required medical expertise. We decline to address these later statements which Defendant did not argue in his brief in chief. *See* Rule 12–213(C) NMRA 2003.

{32} Defendant's argument is perplexing. He first alludes to error on the grounds of prosecutorial misconduct by citing to the responsibility of a prosecutor as a "minister of justice" rather than as an advocate. Rule 16–308 NMRA 2003 and ABA Comment. Yet, his argument shifts to an unrelated and equally elusive theory—that sustaining defense counsel's objection and striking the testimony did not cure the damage done. Defendant's idea seems to be that even though the testimony was excluded, once the jury heard the testimony, it was *implicitly* admitted and its prejudicial effect requires reversal. Defendant further claims that the prejudice caused by the State's accident reconstruction expert's medical opinion was somehow compounded when the district court refused to let his medical expert testify about an area requiring expertise in accident reconstruction.

{33} We underscore our discussion by first noting Defendant's challenge is improper under Rule 12–213(A)(4)(5) NMRA 2003. His brief in chief cites no standard of review, points to no specific error, and requests no particular relief. We further note that despite Defendant's argument that the issue was preserved below through his motion in limine and repeated objections to the line of questioning complained of, Defendant does not cite to anywhere in the record where he preserved any of the arguments he raises on appeal. *State v. Varela*, 1999–NMSC–045, ¶¶ 25–26, 128 N.M. 454, 993 P.2d 1280 (holding timely and sufficiently specific objection is required to preserve error); *see State v. Lucero*, 116 N.M. 450, 453, 863 P.2d 1071, 1074 (1993) (finding issue not preserved where defense failed to state specific objec-

tion raised on appeal). In fact, the record reflects that Defendant did not object on the basis of prosecutorial misconduct nor did he request the district court to take any further action because of any prejudice that was alleged to occur. *Cf. State v. Ruiz*, 2003–NMCA–069, ¶ 4, 133 N.M. 717, 68 P.3d 957 (considering prosecutorial misconduct in eliciting forbidden testimony in violation of trial court order where defense counsel immediately objected, moved for mistrial, and renewed motion for mistrial at close of trial); *State v. Trujillo*, 2002–NMSC–005, ¶ 50, 131 N.M. 709, 42 P.3d 814 (finding the defendant properly preserved issue of prosecutorial misconduct by a timely objection at trial and in a motion to dismiss); *Davila v. Bodelson*, 103 N.M. 243, 249, 704 P.2d 1119, 1125 (Ct. App.1985) (finding the effect of a violation of the district court's order limiting witness testimony was not properly preserved where the defendant failed to request mistrial or cautionary instruction, despite pretrial motion in limine and objection to question designed to elicit testimony). The record further shows defense counsel agreed to the limitation imposed on his own expert. Hence, we find Defendant failed to preserve these issues. *State v. Lucero*, 1999–NMCA–102, ¶ 43, 127 N.M. 672, 986 P.2d 468 (declining to address issue where the defendant failed to cite to the record or describe how the issue was timely and specifically preserved).

{34} To the extent Defendant's argument implies fundamental or plain error, we find no basis under either theory. First, there was no error. Defense counsel objected and moved to strike the testimony which the district court sustained. Defendant requested nothing further from the district court and thus obtained the relief requested. *See In re Crystal L.*, 2002–NMCA–063, ¶ 19, 132 N.M. 349, 48 P.3d 87 (stating that closing statements by the State, while improper, did not constitute reversible error without evidence of substantial prejudice where defense counsel objected and the district court sustained the objection, but the defense did not request curative instruction or other remedy); *State v. Woodward*, 121 N.M. 1, 5, 908 P.2d 231, 235 (1995) (holding that the defendant waived objection to hearsay statement

by asking the district court to caution witness, and having failed to request other relief, relief sought was obtained).

{35} Further, there was more than substantial evidence to convict on the basis of admissible evidence, including eyewitness and expert testimony, photographs showing the extent of damage to the car and to Defendant, as well as testimony regarding the extent of injuries to the front seat passenger. *See Lucero*, 116 N.M. at 453, 863 P.2d at 1074 ("In either [fundamental or plain error], we must be convinced that admission of the testimony constituted an injustice that creates grave doubts concerning the validity of the verdict.").

## III. Jury Instruction

{36} The jury instructions for vehicular homicide by reckless driving, great bodily injury by vehicle, and reckless driving require the jury to find the defendant "operated a motor vehicle." Defendant tendered the following jury instruction to the district court: "A person is 'operating' a motor vehicle if the person is driving the motor vehicle." UJI 14–4511 NMRA 2003 (" 'Operating' or driving a motor vehicle defined."). The State, in turn, requested an amendment, "A person is 'operating' a motor vehicle if the person is: 1. Driving the motor vehicle; or 2. In actual physical control whether or not the vehicle is moving if the vehicle is on a highway." Both parties argued to the district court that their proposed instruction fit the facts of the case. Defendant maintained that since the question of whether he was driving was the only disputed issue, the State had the burden to prove he was *actually* driving. The State countered that Defendant's proposed instruction misstated the law by implicitly requiring someone to actually see him driving. Since no one had seen Defendant driving, but the evidence supported a reasonable inference that he was in "actual physical control" of the vehicle, the amended instruction was more accurate in the State's view. The district court noted that the statutes in question required the jury to find Defendant "operated" rather than "drove" a motor vehicle. The district court concluded that the

jury could find "physical control" under the facts and accepted the amended instruction.

{37} On appeal, Defendant argues that the jury instruction which was given misstated the law. Defendant urges this Court to find that the instruction, sometimes referred to as the *"Boone* instruction," incorporates a much broader definition of "operating a motor vehicle" and a range of activities that was intended to apply to the DWI statute exclusively, and not to vehicular homicide. *See Boone v. State*, 105 N.M. 223, 226, 731 P.2d 366, 369 (1986) (holding that to be convicted under DWI statute, a person must be driving or in actual physical control of the vehicle but motion of the vehicle is not necessary). Instructing the jury that the State only had to prove he was "capable of physical control" rather than actually *driving* was prejudicial according to Defendant, in light of the fact that the jury initially hung on the vehicular homicide charge. Since, in Defendant's view, it was likely the jury was not convinced he was the driver, it could have convicted him under this instruction, without necessarily finding he was "driving in the ordinary sense."

{38} The issue of whether a given jury instruction is proper presents a mixed question of law and fact, which we review de novo. *State v. Gaitan*, 2002–NMSC–007, ¶ 10, 131 N.M. 758, 42 P.3d 1207; *State v. Salazar*, 1997–NMSC–044, ¶ 49, 123 N.M. 778, 945 P.2d 996. A jury instruction is proper, and nothing more is required, if it fairly and accurately presents the law. *State v. Duncan*, 113 N.M. 637, 644, 830 P.2d 554, 561 (Ct.App.1990). To determine whether the instruction is accurate on the law, we review all of the jury instructions that were given as a whole. *Id.; State v. Mantelli*, 2002–NMCA–033, ¶ 16, 131 N.M. 692, 42 P.3d 272. "We [also] review [the instructions as a whole] to determine whether a reasonable juror would have been confused or misdirected by the jury instructions." *State v. Montoya*, 2003–NMSC–004, ¶ 23, 133 N.M. 84, 61 P.3d 793; *State v. Benally*, 2001–NMSC–033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. "[J]uror confusion or misdirection may stem not only from instructions that are facially contradictory or ambiguous, but from instructions

which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *Id.*

{39} Our initial inquiry, therefore, focuses on whether the jury instruction accurately presented the law. A review of the relevant law in New Mexico convinces us that it did. Our legislature has made no distinction between whether a person is charged with driving while intoxicated (DWI), homicide or great bodily injury by vehicle, or reckless driving in the context of whether "operating a motor vehicle" means to drive or be in actual physical control of the vehicle. Each of these offenses is regulated under the Motor Vehicle Code. *Cf.* NMSA 1978, § 66–8–101 (1991); § 66–8–102 (2003); 66–8–113 (1987). The homicide or great bodily injury by vehicle and reckless driving statutes specifically require the State to prove as an element of the offense that the defendant operated or drove a motor vehicle. Sections 66–8–101 and –113. The uniform jury instructions define " 'operating' a motor vehicle" as "[driving the motor vehicle;] [or] [in actual physical control whether or not the vehicle is moving;]." UJI 14–4511. The Use Note expressly instructs parties to "[u]se this instruction if 'operating' or 'driving' is in issue." *Id.* Parties are further instructed to "[u]se only [the] applicable alternative or alternatives." *Id.*

{40} Unlike other statutes in the Motor Vehicle Code, however, the DWI statute prohibits a person from *driving* a motor vehicle. Because the DWI statute is somewhat different than the others, we have construed the term "operating" a motor vehicle as used in UJI 14–4511 as synonymous with the term " 'driving' a motor vehicle" under the DWI statute. *See State v. Tafoya,* 1997–NMCA–083, ¶ 4, 123 N.M. 665, 944 P.2d 894; *see also State v. Grace,* 1999–NMCA–148, ¶ 12, 128 N.M. 379, 993 P.2d 93 ("being in control of a vehicle [is] synonymous with driving for the purposes of the DWI statute") (internal quotation marks and citations omitted). In so concluding, we recognized that the "operating" instruction was patterned after the definition of "driver" as used in NMSA 1978, § 66–1–4.4(K) (1999), which means "every person who *drives or* is in *actual physical control* of a motor vehicle[.]" *State v. Johnson,* 2001–NMSC–001, ¶ 11, 130 N.M. 6, 15 P.3d 1233; *Boone,* 105 N.M. at 225, 731 P.2d at 368 (relying on motor vehicle code's definition of "driver" as person driving or in actual physical control of a motor vehicle to interpret the meaning of "drive" as used in the DWI statute). Hence, it appears that the term "operating" was applied to the DWI statute by statutory construction primarily because the language appeared to limit its application, rather than as an exception to the rule as Defendant maintains. The plain language of the vehicular homicide and reckless driving statutes, as well as the entire statutory scheme, indicate that the legislature intended the definition of "operating" a motor vehicle to be applicable to all statutes within the Motor Vehicle Code, unless otherwise stated.

{41} We also find that the jury instruction that was given would not confuse a reasonable jury on the law when considered in context with the other instructions that were given. Vehicular homicide by reckless driving, great bodily injury by reckless driving, and reckless driving specifically require the jury to find the defendant drove recklessly. Both instructions on these crimes not only require the jury to find that the "defendant operated a motor vehicle" but also that "the defendant *drove* with willful disregard of the safety of others and at a speed or in a manner that endangered or was likely to endanger any person." UJI 14–241 NMRA 2003 (defining "Homicide by vehicle; 'driving in a reckless manner' ") (emphasis added), or that "[t]he defendant *drove* carelessly and heedlessly in willful or wanton disregard of the rights or safety of others and without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property." UJI 14–4504(2) NMRA 2003 (outlining elements for "Reckless driving") (emphasis added).

{42} Thus Defendant's argument that the jury might have convicted him even if he was not driving in the ordinary sense is without merit. There is no doubt that the jury found Defendant was "driving" at the time of the accident "in the ordinary sense" of the word.

## IV. Mistrial

{43} The jury retired to deliberate shortly after noon on Friday. At a little past 4:00 p.m., the jury sent a note to the district court judge. The judge told counsel that the note indicated the jury was "deadlocked on Count 1 and Count 4," but had reached verdicts on Counts 2, 3, and 5, and that he would not disclose the actual verdicts. Counsel agreed to poll each juror in open court to ascertain whether they believed they were "hopelessly deadlocked" and whether further deliberation would be helpful. The record reflects that ten jurors responded they were hopelessly deadlocked and that further deliberations would not be helpful. Two jurors, however, answered they were not hopelessly deadlocked, and further deliberations would be helpful.

{44} Consequently, the district court proposed to accept the verdicts and declare a mistrial on the remaining counts. The prosecutor disagreed, since one of the ten jurors had hesitated and the jury had been deliberating for only a short time. Defense counsel preferred to send the jury back to deliberate. When asked for how long, defense counsel responded "another hour." Both parties agreed, however, that rather than trying to rush a verdict, the jury should be sent home for the weekend.

{45} After excusing the jury, the judge received a second note from one of the undecided jurors. The district court revealed its contents to counsel, which read "Count 1 No. 4, the word 'foresee' [is] the only thing that we [are] deadlocked on." After advising counsel that there were numerical values written on the verdict forms which were crossed out, the judge agreed to let the jury recess for the weekend. Without any further instruction or admonishment, except to leave their trial notes and refrain from deliberating on Monday until everyone on the panel was present, the judge promised a cooler jury room and released the jury for the weekend. Two hours after deliberations resumed on Monday, the jury reported a unanimous verdict on all counts. Defendant was acquitted on Count 4 (stolen vehicle) but convicted on the remaining counts. Each juror then unequivocally affirmed the verdicts.

{46} On appeal, Defendant claims that it was fundamental error to send the jury back to deliberate after it was polled on how hopeless further deliberations would be, especially after it revealed the numerical breakdown. Defendant further claims that withholding the numerical breakdown from counsel violated his right to be "present" at all critical stages of the prosecution and deprived him of the critical knowledge needed to make the decision whether to request a mistrial.

{47} Fundamental error is an exception to the rule that parties must preserve issues for appeal. Rule 12–216(A), (B)(2) NMRA 2003; *State v. Cunningham*, 2000–NMSC–009, ¶ 10, 128 N.M. 711, 998 P.2d 176. Because it is the exception rather than the rule, this Court exercises its discretion to review a claim for fundamental error in only rare instances and solely to prevent a miscarriage of justice where some fundamental right has been invaded. *See State v. Reyes*, 2002–NMSC–024, ¶¶ 41–42, 132 N.M. 576, 52 P.3d 948; *Cunningham*, 2000–NMSC–009, ¶ 12, 128 N.M. 711, 998 P.2d 176; *State v. Jett*, 111 N.M. 309, 314, 805 P.2d 78, 83 (1991). To rise to the level of fundamental error, the error must go "to the foundation or basis of a defendant's rights or must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive." *Cunningham*, 2000–NMSC–009, ¶ 13, 128 N.M. 711, 998 P.2d 176 (internal quotation marks and citation omitted). Consequently, parties who have not preserved an issue for appeal bear a much higher burden to show fundamental error than under a reversible error standard. *See id.* ¶ 21. Under a fundamental error standard, the party asserting error must demonstrate the existence of circumstances that "shock the conscience" or implicate a fundamental unfairness within the system that would undermine judicial integrity if left unchecked. *Id.* (distinguishing the level of scrutiny afforded to fundamental error and reversible error).

{48} Defendant does not argue that his innocence is indisputable or his guilt so doubtful that the jury's verdict "shocks the conscience." *See Reyes*, 2002–NMSC–024,

¶ 42, 132 N.M. 576, 52 P.3d 948 (finding of fundamental error only in the absence of substantial evidence to support the verdict); *Cunningham,* 2000–NMSC–009, ¶ 13, 128 N.M. 711, 998 P.2d 176. Indeed, he does not even claim there was a lack of substantial evidence to support his conviction. *State v. Clark,* 1999–NMSC–035, ¶ 3, 128 N.M. 119, 990 P.2d 793 (holding issues raised in docketing statement but not argued in the brief in chief are deemed abandoned). Defendant instead argues that the coercive effect of the district court's instruction to the jury to deliberate in the face of hopeless deadlock and with knowledge of the numerical division of the jury, rather than to declare a mistrial, deprived him of his constitutional right to a fair and impartial trial. *See State v. Rickerson,* 95 N.M. 666, 667–68, 625 P.2d 1183, 1184–85 (1981) (considering whether inquiry into jury's numerical division violated due process).

{49} For the trial to be considered fundamentally unfair in this instance, Defendant must demonstrate that the cumulative effect of the district court's actions and the circumstances under which they arose were so egregious and so unduly coercive on the jury to abandon its honest convictions to arrive at the verdict that those actions and circumstances violated his right to a fair and impartial trial. *See State v. McCarter,* 93 N.M. 708, 711, 604 P.2d 1242, 1245 (1980) (holding that the coercive nature of the district court's handling of jury deadlock violated due process); *see also Rickerson,* 95 N.M. at 667–68, 625 P.2d at 1184–85 (reaffirming rule that convictions will be reversed only if cumulative effect of trial court's actions had coercive effect on the jury). Specifically, Defendant argues that sending the jury back to deliberate, despite ten jurors' belief that they were hopelessly deadlocked, amounted to a "shotgun" instruction, which was especially egregious, in Defendant's view, because the district court knew the numerical division of the jury on those counts. Defendant urges that the direction to deliberate pressured the holdout jurors to change their votes.

{50} An inquiry into the numerical division does not constitute error unless the cumulative effect of the district court judge's conduct was coercive. *Rickerson,* 95 N.M. at 668, 625 P.2d at 1185. To determine whether such inquiry has a coercive effect on jurors, we consider:

> (a) whether any additional instruction or instructions, especially a shotgun instruction, were given: [sic] (b) whether the court failed to caution a jury not to surrender honest convictions, thus pressuring holdout jurors to conform, and (c) whether the court established time limits on further deliberations with the threat of a mistrial.

*Id.* at 667, 625 P.2d at 1184.

{51} As a starting point, we believe the unsolicited revelation of the numerical breakdown substantially decreased any risk of coercion under these facts. *See id.* at 668, 625 P.2d at 1185 ("The inquiry itself is not coercive since the jury is already well aware of its numerical split."). In any event, there was no time limit imposed on deliberations, and prior to deliberation, jurors were instructed not to surrender their honest convictions. UJI 14–6008 NMRA 2003 and Use Note. Resolution of this issue thus turns on the question of whether the district court's actions were the equivalent of a "shotgun" instruction.

{52} The use of a shotgun instruction is prohibited by our Supreme Court. UJI 14–6030 NMRA 2003 and Use Note; *McCarter,* 93 N.M. at 711, 604 P.2d at 1245. The primary concern with a shotgun instruction is the potentially coercive effect it has on holdout jurors to abandon their convictions to arrive at a verdict with the majority. *See id.* (noting the Supreme Court has recognized the instruction as coercive); *State v. Travis,* 79 N.M. 307, 309, 442 P.2d 797, 799 (Ct.App.1968) (recognizing that use of the then approved shotgun instruction would be improper if it coerced jury into agreement or unduly hastened their consideration). Nevertheless, when a jury communicates with the district court during deliberations and expresses its inability to arrive at a verdict, "the judge *must* communicate with that jury in some fashion." *State v. Neely,* 112 N.M. 702, 712, 819 P.2d 249, 259 (1991) (emphasis added) (internal quotation marks and citation omitted); *McCarter,* 93 N.M. at 710, 604 P.2d at 1244. Communication is proper so long as

it "leaves with the jury the discretion whether or not it should deliberate further." *Id.* Hence, "[t]he court can inform the jury that it *may* consider further deliberations, but not that it *must* consider further deliberations." *Id.*

{53} In *McCarter,* for example, the jury sent a note to the judge, indicating it was deadlocked, eleven to one. 93 N.M. at 710, 604 P.2d at 1244. Over defense counsel's motion for a mistrial and objection, the district court responded by note advising the jury, "You must consider further deliberations." *Id.* The jury voted to convict only ten minutes after receiving the note and when polled "[i]s this your verdict?" one juror responded "Reluctantly." *Id.* The Supreme Court found the note was tantamount to a shotgun instruction, which coupled with the revelation of the numerical division, was implicitly coercive on the lone juror who did not favor conviction. *See id.* at 710–11, 604 P.2d at 1244–45.

{54} A similar argument, however, was rejected by the Court in *Neely,* 112 N.M. at 712, 819 P.2d at 259. There, the jury advised the district court it was deadlocked after several days of deliberation. *Id.* The district court asked the foreperson, without objection from defense counsel, whether further deliberations would be helpful. The foreperson responded affirmatively and the district court instructed the jury to resume deliberations. *Id.* Shortly thereafter, a verdict was reached. *Id.* On appeal, the defendant asserted that the district court's direction to resume deliberations effectively forced the holdout juror to find the defendant guilty. *Id.* The Supreme Court held that the district court's communications with the jury were not coercive because the jury was advised it could, not that it must, deliberate further. *Id.*

{55} Based on these cases, and others like them, we find there was no shotgun instruction or its equivalent given in this case. First, unlike *McCarter,* the district court asked the jury whether it *could* deliberate. Two jurors clearly affirmed their willingness. The perception of the ten jurors who believed the jury was "hopelessly deadlocked" must be viewed in this context.

{56} *McCarter* and its progeny also teach us that in determining whether the jury was coerced to arrive at a verdict, the actions as well as the circumstances under which the court's actions arose should be considered. *See Rickerson,* 95 N.M. at 667–68, 625 P.2d at 1184–85 (affirming *McCarter* rule that in determining whether jurors were coerced to arrive at a verdict, the cumulative effect of the district court's actions and circumstances under which they arose should be considered). The record reflects that the jurors had been deliberating for only four hours on a Friday afternoon in a hot jury room. This information was relevant to the district court's determination of whether there was a probability of reaching a verdict. Further, the district court admonished jurors to answer these two questions with a simple "yes or no." It did not attempt to target the holdout jurors or to determine which way the votes fell. If anything, the district court was attempting to avoid this effect. Also, there were no further instructions or lectures from the judge, and despite defense counsel's own suggestion, the judge did not place a time limit on deliberations. *See State v. Nelson,* 63 N.M. 428, 433, 321 P.2d 202, 205 (1958) (pointing out that the district court's repeated reminders of what jurors said on voir dire regarding death penalty was coercive on the one holdout juror); *see also Pirch v. Firestone Tire & Rubber Co.,* 80 N.M. 323, 326–27, 455 P.2d 189, 192–93 (Ct.App.1969) (holding that judge's remarks relating to length of trial, expense involved, importance of case, and setting time limit on deliberations was coercive).

{57} Nor is there any evidence of juror coercion surrounding the second, unsolicited note from one apparently undecided juror. This note was not disclosed to the other jurors, and there were no further instructions to the jury regarding it. The district court instead related this information to counsel and released the jury for the weekend. The lack of coercion is self-evident in light of the fact that the jurors deliberated for two hours more on Monday and returned a "not guilty" verdict on one count. Accordingly, we cannot say the district court's actions were so coercive as to warrant the extreme remedy of fundamental error.

{58} Neither are we persuaded that the district court erred by not revealing the numerical breakdown of the jury to counsel. We acknowledge that the defendants and their counsel have a right to be present at all critical stages of a trial. U.S. Const. amends. VI and XIV; N.M. Const. art II, § 14; Rule 5–612(A) NMRA 2003; *State v. Padilla,* 2002–NMSC–016, ¶ 11, 132 N.M. 247, 46 P.3d 1247. We also recognize that the district court must disclose any ex parte communications it has with the jury. *McCarter,* 93 N.M. at 711, 604 P.2d at 1245. However, assuming, without deciding, that these requirements provide authority for the proposition that counsel has a right to know the numerical breakdown of the jury, we do not find that the district court's decision to withhold this information amounted to fundamental error.

{59} "To constitute a critical stage of a criminal proceeding, the particular proceeding or act in question must be one at which, or in connection with which, the accused's constitutionally protected rights may be lost or adversely affected." *State v. Acuna,* 78 N.M. 119, 120, 428 P.2d 658, 659 (1967). Although Defendant maintains the information was "critical knowledge" he needed to decide whether to agree to a mistrial, he does not show how he was prejudiced. *Cf. Smith v. United States,* 542 A.2d 823, 826 (D.C.Ct.App.1988) (holding that whether the majority favored conviction or acquittal was a critical factor in the defendant's decision whether to request a shotgun instruction since precedent prohibited the instruction in such circumstances). The jury's note did not indicate whether it favored conviction or acquittal. The verdict forms that were sent with the note were ambiguous. We do not know, and Defendant does not show, how this information would have been helpful in the decision-making process. Accordingly, we find no fundamental error.

## V. Cumulative Error

{60} Because we find no error in any of the issues raised, there is no cumulative error. *State v. Aragon,* 1999–NMCA–060, ¶ 19, 127 N.M. 393, 981 P.2d 1211.

## CONCLUSION

{61} Based on the foregoing, we affirm Defendant's conviction on all counts. We therefore remand the case to the district court to amend its judgment vacating Defendant's convictions for reckless driving.

{62} **IT IS SO ORDERED.**

WE CONCUR: CELIA FOY CASTILLO and RODERICK T. KENNEDY, Judges.